[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 15, 2008
THOMAS K. KAHN
CLERK

_____

No. 06-11344

_____

D. C. Docket No. 04-60750-CV-WPD

JACK L. ARONOWITZ,
HEALTH-CHEM DIAGNOSTICS, LLC,
a Florida Corporation,
LEON SERVICES, LLC,
a Florida Corporation,

Plaintiffs-Counter
Defendants-Appellants,

versus

HEALTH-CHEM CORPORATION,
a Delaware Corporation,

Defendant-Counter
Claimant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(January 15, 2008)**

Before BIRCH, FAY and CUDAHY,[*] Circuit Judges.

PER CURIAM:

Plaintiffs-counter defendants-appellants, Jack Aronowitz, Health-Chem Diagnostics LLC, and Leon Services LLC (collectively "Aronowitz"),[1] appeal an "Omnibus Order" by the district court for the Southern District of Florida addressing a number of post-trial motions. The order (1) set aside the jury verdict that had been rendered in Aronowitz's favor as to his first breach of contract claim against defendant-counter claimant-appellee Health-Chem Corporation ("Health-Chem"); (2) reduced the damages awarded with respect to the second breach of contract claim against Health-Chem from $2.6 million to nominal damages of $1; (3) upheld the jury's verdict against Aronowitz on Health-Chem's counterclaim for trademark infringement; and (4) conditionally granted a new trial to Health-Chem in the event the court's primary rulings were reversed. We AFFIRM in part, REVERSE in part, and REMAND for a new trial as to damages for breach of the 2003 contract.

---

[*]Honorable Richard D. Cudahy, United States Circuit Judge for the Seventh Circuit, sitting by designation.

[1]Leon Services LLC was Aronowitz's business entity prior to the 2003 contract. Health-Chem Diagnostics LLC was the diagnostic research facility that he established under the terms of the 2003 contract.

# I. BACKGROUND

This appeal arises out of a business dispute between Health-Chem, a company that manufactures transdermal pharmaceutical patches, and Aronowitz, an inventor of diagnostic medical products. In 2002, the parties signed three agreements, a Master Agreement, a License Agreement, and a Security Agreement (collectively "2002 Contract"), by which they agreed to enter into a joint venture for the marketing and development of one of Aronowitz's inventions, the "TD Glucose" patch, a transdermal patch that takes a diabetic's glucose reading without having to draw blood. Under the 2002 Contract, Health-Chem agreed to provide $10,000 per month in funding to Aronowitz to help develop the patch at Health-Chem's Diagnostic Division research facility and to employ him there as a director and consultant.[2] Health-Chem also agreed to pay a licensing fee to Aronowitz for rights in his diagnostic products, including an up-front licensing fee of approximately $233,000 for the first three months. The 2002 Contract also gave Health-Chem an option eventually to buy the rights to the TD Glucose patch.

After a series of disputes over money owed under the 2002 Contract, and sensing that the venture was not working out, the parties met and negotiated a new arrangement in 2003 "in order that [Health-Chem could] cease further funding of

---

[2]This facility was located in Florida rather than in Pennsylvania (where the rest of Health-Chem was located) because Health-Chem had acquired it out of bankruptcy proceedings.

3

its Diagnostic Division and that [Aronowitz could] assume financial responsibility and management direction of [the TD Glucose development business], with minimum interruption to the operations." R1-31, Exh. G at 1. Under the new arrangement, the parties agreed that Aronowitz's employment with Health-Chem would cease and that he would create a new business entity to develop the TD Glucose patch. The parties also agreed to the assignment of the 2002 Contract to the new entity such as to "terminate all obligations and stipulations of [the 2002 contracts] between Aronowitz and Health-Chem Corporation," as of the date of the agreement and to have the new entity assume them. Id. at 2. The contract further provided that

> If the assignment of the [2002] Contract, as described above, is not performed, nevertheless the parties agree to terminate all financial obligations of [Health-Chem Corporation] to [Aronowitz and his business entities] as of the above date of this Agreement, including . . . specifically, but not exclusively, ceasing all financial obligations of Health-Chem Corporation with regard to the Diagnostic Division.

Id. Although the new agreement terminated Health-Chem's obligation to provide monthly funding for the development of the TD Glucose patch, Health-Chem did agree to provide certain supplies and equipment to Aronowitz – most notably "Weiss wands," which were necessary to perform the clinical trials. Id. at 4. The parties also agreed to a "Cut-off Payments and Expenses" provision which allocated certain specific expenses and provided that "[a]ny expenses not

4

[specifically listed would] become the responsibility of the party to whom the goods or services were delivered based on the date of delivery." Id. at 3. Under this provision, Health-Chem was responsible for any goods or services delivered prior to execution of the 2003 contract and Aronowitz was responsible for any unlisted goods or services delivered thereafter.

The 2003 contract also granted Aronowitz's new entity a limited license to use the trademark "Health-Chem Diagnostics" in connection with its TD Glucose patch development. Such use was to be limited to the new entity's company "name and literature." Id. Finally, under the 2003 contract, Health-Chem retained an option to purchase the rights to the TD Glucose patch, and Aronowitz was guaranteed five percent of net sales.

Within two weeks of its execution, disputes arose between the parties over the provisions of the 2003 contract. Aronowitz alleged that Health-Chem had failed to pay the electricity bill at the now transferred Diagnostic Division research facility and that the power was going to be cut off; he also alleged that Health-Chem had failed to provide him with the Weiss wands. Aronowitz asserted that Health-Chem's conduct entitled him to cancel its option on the TD Glucose patch.

In June 2004, Aronowitz filed suit against Health-Chem. In an amended complaint, he alleged two separate counts of breach of contract: one for the 2002

Contract and one for the 2003 contract. Health-Chem raised, <u>inter alia</u>, the defense

of novation with respect to the 2002 Contract, arguing that the 2003 agreement

superseded the 2002 agreement and nullified any possible claim for breach.

Health-Chem also initiated a counterclaim against Aronowitz for trademark

infringement, alleging that Aronowitz had used the more general two-word mark

"Health-Chem" without its permission. A jury trial was held in October 2005. At

the close of Aronowitz's case, Health-Chem moved for judgment as a matter of

law on two grounds: first, that the 2003 contract effectuated a novation of the 2002

Contract, thereby eliminating any claim for breach of the 2002 Contract; and,

second, that Aronowitz's claimed damages for lost profits under the 2003 contract

were too speculative. The trial court "grudgingly" denied the motion.[3] R10 at 45.

Health-Chem renewed its motion at the close of all of the evidence. The court

again denied the motion, this time stating that it was "concerned about the effect

that the 2003 agreement had on the 2002 agreement, but [was] not going to prevent

the jury at this point from considering it." R17 at 175. Aronowitz moved for

judgment as a matter of law on the trademark infringement claim; the court also

---

[3]The district court had previously touched on this issue much earlier in the case in its denial of Health-Chem's motion to strike Aronowitz's demand for a jury trial. The court had ruled that "The October 31, 2003 Agreement provided for an assignment of the [2002 Contract] and that the 'effects of this assignment will be to terminate all obligations and stipulations' of [that agreement] . . . For [that] reason, the [2002 Contract] provision of a waiver of jury trial was terminated by the October 31, 2003 agreement." R1-40 at 2.

denied that motion.

Just prior to closing arguments and jury instruction, Health-Chem proposed two alternative amended verdict forms. The first, which omitted any mention of breach as to the 2002 Contract, would have been applicable had the court granted judgment as a matter of law on the issue of novation. The second began by asking the jury to decide whether the 2002 Contract had been superseded by the 2003 contract. The court ruled against use of either of the proposed forms.

The jury returned a verdict in favor of Aronowitz as to each breach of contract claim. Specifically, it awarded damages of $331,000 as to breach of the 2002 Contract and $2.6 million as to breach of the 2003 contract. The jury, however, returned a verdict against Aronowitz on Health-Chem's counterclaim, finding that Aronowitz had infringed on the "Health-Chem" trademark. On that claim, it awarded $25,000 in damages to Health-Chem. The parties renewed their respective motions for judgment as a matter of law, which the district court addressed together in its February 2006 "Omnibus Order."

With respect to Health-Chem's renewed motion, the district court first observed that the "only fair construction" of the plain terms of the 2003 contract was that the "parties intended to extinguish their contractual obligations" under the 2002 Contract, effecting a novation as a matter of law and making "[t]he jury's

7

finding to the contrary [] legally unreasonable." R4-154 at 16. The court went on to find that even if that construction were incorrect, "the only reasonable conclusion based upon the evidence presented at trial [was] that the parties intended the 2003 Agreement to extinguish" the 2002 Contract. Id. The court concluded that Aronowitz's contention that the 2003 Agreement "applie[d] only prospectively [fell] short of creating a substantial conflict in the evidence" and that Health-Chem was entitled to judgment as a matter of law in its favor as to breach of the 2002 Contract. Id.

As to the jury's $2.6 million verdict for breach of the 2003 contract, operating under the assumption that the award had been based solely on Aronowitz's alleged lost profits, the court observed that "the record fails to contain sufficiently 'competent and substantial' evidence [to demonstrate] a causal connection between [Health-Chem's] breach and [Aronowitz's] lost future profits." Id. at 12. The court reasoned that too many obstacles stood between Health-Chem's fulfilled obligations under the 2003 contract and the TD Glucose patch's generation of profit. The court particularly pointed to the need to raise at least $10 million more for research and development, the completion of successful clinical trials, obtaining FDA approval, and proving success in the market.

The court went on to observe that even if a causal connection had been

shown, "insufficient evidence was presented to measure the damages with reasonable certainty." Id. at 13. However, because the court also found that the record contained sufficient evidence to support the jury's conclusion that Health-Chem did breach the 2003 contract, the court entered judgment in favor of Aronowitz, but in the amount of only $1 in nominal damages (as required by Florida law).

As to the trademark infringement claim, Aronowitz had argued for judgment as a matter of law on the grounds that he had not used the mark without permission and, even if he had, that the use was not likely to cause confusion. The district court rejected these arguments, observing that the license given in connection with Aronowitz's research and development efforts had been limited to the use of the name "Health-Chem Diagnostics," but that Aronowitz had gone further and used the more general (and separately registered) two-word mark "Health-Chem" on his entity's website. Because the mark used was not equivalent to "Health-Chem Diagnostics," the court found that there had been an illicit and unauthorized use. The court then pointed to evidence in the record that both customers and potential employees had been confused by the use: customers had mistaken Aronowitz's website for Heath-Chem's and a potential employee had mistakenly believed that Health-Chem was located in Pompano Beach, Florida. Accordingly, the court

found that enough evidence had been presented as to each element of the trademark infringement claim "to create a substantial conflict in the evidence," thereby making judgment as a matter of law "inappropriate." Id. at 8, 10. The court also upheld the jury verdict imposing $25,000 in damages, explaining that "courts have wide discretion in determining the just amount of recovery on a trademark infringement claim" and that Health-Chem had presented sufficient evidence "to support the award of prospective corrective damages." Id. at 10.

Finally, the court made a conditional ruling on Health-Chem's alternative motion for a new trial. The court found, for the same reasons covered in its discussions of breach, that the jury's verdicts as to breach of the 2002 and 2003 contracts had been against the great weight of the evidence presented. The court also found it had erred in refusing to submit two special interrogatories Health-Chem had requested be added to the verdict form regarding: (1) whether the 2002 Agreements were terminated by the 2003 Agreements, and (2) whether [Aronowitz] had fraudulently induced [Health-Chem] to enter into the 2002 Contract, despite the fact that "both novation and fraudulent inducement were material issues raised by the pleadings and evidence presented at trial." Id. at 21. In light of these errors, the court granted Health-Chem's motion for a new trial in the alternative, in case the court's judgments as a matter of law were reversed on

10

appeal.

On appeal, Aronowitz argues that the district court erred in (1) finding, as a matter of law, that the 2003 contract constituted novation of the 2002 contract; (2) reducing the $2.6 million verdict to $1 in nominal damages on the ground that there was insufficient evidence to support the jury's award on the basis of lost profits; (3) denying Aronowitz's motion for judgment as a matter of law on the trademark infringement counterclaim; and (4) conditionally granting Health-Chem a new trial in the alternative. Aronowitz also argues that, in the event we reverse either judgment as a matter of law but do not reinstate the jury verdicts, he is entitled to a new trial as to damages only.

## II. DISCUSSION

A. Judgements as a Matter of Law

We review de novo a district court's ruling on a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50. Doe v. Celebrity Cruises, Inc., 394 F.3d 891, 902 (11th Cir. 2004) (citation omitted). In so doing, we apply the same standard as the district court. Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998). The district court may grant judgment as a matter of law "at the close of evidence or, if timely renewed, after the jury has returned its verdict, as long as 'there is no legally sufficient evidentiary basis for a reasonable jury to

11

find'" for the non-moving party. <u>Lipphardt v. Durango Steakhouse of Brandon, Inc.</u>, 267 F.3d 1183, 1186 (11th Cir. 2001) (quoting Fed. R. Civ. P. 50). In undertaking this analysis we examine all evidence in a light most favorable to the non-moving party. <u>Celebrity Cruises</u>, 394 F.3d at 902 (citation omitted).

1. *Breach of 2002 Contract*

Aronowitz first challenges the court's judgment as a matter of law in favor of Health-Chem as to breach of the 2002 Contract, citing the following points in support of his argument that there was no novation: 1) the parties modified the final wording such that it terminated all "financial obligations" rather than all "contractual obligations;" 2) the assignment of the 2002 Contract provided for by the 2003 contract never actually occurred; and 3) the 2003 contract included a "schedule of expenses" which specifically allocated responsibility for expenses going forward, but did not mention debts still owed under the 2002 contract.

"A novation is a mutual agreement between the parties for the discharge of a valid existing obligation by the substitution of a new valid obligation." <u>Jakobi v. Kings Creek Vill. Townhouse Ass'n</u>, 665 So. 2d 325, 327 (Fla. Dist. Ct. App. 1995).[4] Under Florida law, four elements are required to effectuate the novation of a binding contract: (1) a previously valid contract; (2) agreement of the parties to

---

[4]Apparently, the heart of the disagreement between the majority and partial dissent in this case concerns the breadth of the effect of a novation upon existing contractual obligations.

12

cancel that contract; (3) a new valid and binding contract; (4) agreement of the parties that the new contract will replace and extinguish the old one. Thompson v. Jared Kane Co., 872 So. 2d 356, 361 (Fla. Dist. Ct. App. 2004); Jakobi, 665 So. 2d at 327. The parties concede that the only element at issue here is the intention of the parties as to the 2002 Contract.

Intent may be inferred from the totality of the circumstances surrounding the transaction. Thompson, 872 So. 2d at 361. The question of intent "is generally a question of fact" for a jury. Wolowitz v. Thoroughbred Motors Inc., 765 So. 2d 920, 923 (Fla. Dist. Ct. App. 2000). However, "[w]here the terms of a written agreement are not in doubt, the question of whether it effects a novation is one of law for the court." S.N.W. Corp. v. Hauser, 461 So. 2d 188, 189 (Fla. Dist. Ct. App. 1984); see also Sink v. Abitibi Price Sales Corp., 602 So. 2d 1313, 1316 (Fla. Dist. Ct. App. 1992) (finding novation as a matter of law where the parties entered into "an entirely new and unambiguous agreement of equal or greater dignity to the agreement first made with respect to the same subject") (quoting Evans v. Borkowski, 139 So. 2d 472, 474 (Fla. Dist. Ct. App. 1962).

Here, the language of the 2003 contract states that the assignment for which it provides "terminate[s] all obligations and stipulations of the [prior 2002] contract between Aronowitz and Health-Chem Corporation," as of the date of the contract's

13

execution. R1-31, Exh. G at 2. Further, the contract provides that even absent that assignment, "the parties agree to terminate all financial obligations of [Health-Chem to Aronowitz] under the [2002 Contract]." Id. We agree with the district court that the only reasonable conclusion based on this language is that the parties intended to extinguish the 2002 Contract.

Even if the contract's language were sufficiently ambiguous as to intent regarding the 2002 Contract to allow us to consider parol evidence, we find that the only reasonable conclusion to be drawn from the evidence at trial is that the parties intended novation. First, Aronowitz points out that, before execution of the contract, the draft provision which stated the parties agreed to "ceas[e] all contractual obligations" between Health-Chem and Aronowitz, was altered to say "ceas[e] all financial obligations." See Appellant's Br. at 33 (referring to R1-31, Exh. G at 2). Aronowitz asserts that this change suggests that the parties intended only to cut off Health-Chem's obligation to fund the TD Glucose patch division, not to extinguish all obligations under the 2002 Contract. We are not convinced. The context of the paragraph in which the change was made suggests instead that the change was made for the sake of consistency in terms within the sentence rather than out of concern over significant difference in meaning. The entire sentence reads, in pertinent part: "If the assignment . . . is not performed,

14

nevertheless the parties agree to terminate all <u>financial obligations</u> of [Health-Chem] to [Aronowitz] . . . including the termination of all employees of Health-Chem at the Diagnostic Division, and specifically but not exclusively ceasing all <u>financial [originally contractual] obligations</u> of Health Chem Corp with regard to the Diagnostic Division and its vendors and obligees, except as set forth in this agreement." R1-31, Exh. G at 2 (emphasis added). Accordingly, we do not find the replacement of the term "contractual" with the term "financial," in that context, to have created any ambiguity, particularly since what Aronowitz asserts, in terms of breach, is a lingering financial obligation.

Further, the failure of the parties to complete the assignment of the 2002 Contract is irrelevant in the face of the 2003 contract provision that the parties will "terminate" and "ceas[e]" all financial obligations between the parties even "[i]f the assignment of the [2002] contract . . . is not performed." Id. Additionally, we find that the "Cut-Off Payment and Expenses" provision in the 2003 contract, assigning responsibility for payments and expenses over the period of transition does not establish that the parties intended the 2002 Contract to remain binding and in full effect. Any financial obligations not specifically mentioned were, by the plain language of the contract, to be "terminated." In fact, it seems to us that the presence of a such a cut-off payment provision in the 2003 contract bolsters

15

Health-Chem's contention that the 2003 contract was intended to effectuate a severance of the parties' business relationship. Accordingly, we find that the 2003 contract constituted "an entirely new and unambiguous agreement of equal or greater dignity to the agreement first made with respect to the same subject." See Sink, 602 So. 2d at 1316. As such, we agree with the district court that the only reasonable conclusion to be drawn from the evidence is that the 2003 contract constituted a novation of the 2002 Contract.

2. *Breach of 2003 Contract*

Aronowitz next challenges the court's grant of judgment as a matter of law declaring the $2.6 million in damages awarded by the jury for breach of the 2003 contract to be impermissibly speculative and awarding Aronowitz $1 nominal damages instead. In making this ruling, the district court apparently assumed the jury awarded damages solely in compensation for lost profits.

Under Florida law, an award for expectation damages will not be permitted unless the expected amount can be established with reasonable certainty. Levitt-Ansca Towne Park P'ship v. Smith & Co., 873 So. 2d 392, 396 (Fla. Dist. Ct. App. 2004); Lipscher v. LRP Publ'ns, Inc., 266 F.3d 1305, 1317 (11th Cir. 2001) (applying Florida law). Although a business claiming lost profits is not required to show a successful operational "track record," at a minimum, the lost profit

16

damages amount must be determined by some reasonable standard or yardstick. W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd., 545 So. 2d 1348, 1351 (Fla. Dist. Ct. App. 1989) (per curiam). We observe that an expectation of royalties on future net sales is merely a subset of lost future profits and therefore subject to the same burden of proof for damages as lost profits would be.

Although we agree with the district court that the evidence presented was insufficient to provide any reasonable certainty by which to calculate damages due to lost royalties, we do not see that the damages award made by the jury was necessarily based solely upon lost royalties. During Aronowitz's closing argument, he asked specifically not only for $5 million in lost royalties, but also for $94,000 for the Weiss wands never purchased by Health-Chem and approximately $15,000 in connection with a payment from a third party erroneously made to and retained by Health-Chem after execution of the 2003 contract. Testimony presented by Aronowitz during the course of the trial also raised other possible smaller bases for compensatory damages. Because it is impossible, in the absence of interrogatories on the verdict form, for us to determine what factors the jury might have considered in calculating its $2.6 million verdict, we are unable to say that the entirety of that verdict was

17

unsupported.[5]  However, absent the impermissibly speculative damages claimed for lost royalties, the award could not have reached $2.6 million.  Accordingly, we reverse the court's judgment as a matter of law reducing the damages to $1, but we decline to reinstate the jury's verdict.

3. *Trademark Infringement*

Aronowitz also appeals the district court's denial of his motion for judgment as a matter of law on the trademark infringement counterclaim.  A successful cause of action for trademark infringement requires the evidence to establish that the infringer 1) used the mark in commerce, without consent; and 2) that the use was likely to cause confusion.  John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 972 (11th Cir. 1983).

Aronowitz does not contest the allegation that he used the shorter mark "Health-Chem" on his company's website, but argues that Health-Chem "did not and cannot show a likelihood of confusion."  Appellant's Br. at 51.  We have recognized seven factors to be considered as to the likelihood of confusion: (1) type of mark; (2) similarity of mark; (3) similarity of the products the marks

_____

[5]Aronowitz also argues that he introduced evidence that $2.5 million would be required to complete research, development, and FDA approval of the TD Glucose patch and that the jury might have based its award on this amount due to Health-Chem's failure "to cooperate fully to secure funding, distribution, and FDA approval."  Appellant's Br. at 41 (quoting R1-31, Exh. G at 4]).  However, this particular argument was not raised before the trial court.  Further, the record does not reflect Aronowitz having presented this amount to the jury as a direct basis for damages.

represent; (4) similarity of the parties' retail outlets and customers; (5) similarity of advertising media; (6) defendant's intent; and (7) actual confusion. Frehling Enters. v. Int'l Select Group, Inc., 192 F.3d 1330, 1335 (11th Cir. 1999). "Of these, the type of mark and the evidence of actual confusion are the most important." Id.

There are four recognized types of mark, ranging from weakest to strongest: generic, descriptive, suggestive and arbitrary. Id. "The stronger the mark, the greater the scope of protection accorded it." Id. A mark's strength is enhanced where there is little or no third-party use of that mark. Id. at 1336. With regard to actual confusion, we have specifically accorded "substantial weight" to evidence that actual customers were confused by the use of a mark as opposed to other categories of people. Safeway Stores, Inc. v. Safeway Disc. Drugs, 675 F.2d 1160, 1167 (11th Cir. 1982).

Here, the parties apparently agree that the Health-Chem mark is a suggestive mark, thus putting it in the second strongest category, meriting a higher level of protection than if it were categorized as generic or descriptive. See Frehling, 192 F.3d at 1335-36. Additionally, the only mention of any third-party usage of the Health-Chem mark is contained in a question Aronowitz's attorney asked Ken Brody, Health-Chem's chief financial officer, about a company in California that

19

might be using the same name. Brody did not confirm it. Thus, there is no positive testimony or other evidence that any third party uses the mark, thereby according it even more strength and meriting further protection. See Frehling, 192 F.3d at 1336.

Finally, the record contains evidence of actual confusion. First, there was testimony that potential Health-Chem customers who had been to the Health-Chem Diagnostics website looking for Health-Chem's transdermal pharmaceutical patches expressed confusion about whether Health-Chem had a facility in Florida, about whether Health-Chem still made the patches they were looking for, and about whether Aronowitz – who was associated with the failure of a previous company – was associated with Health-Chem. There was also testimony that a potential employee of Health-Chem was concerned, after looking at the Health-Chem Diagnostics website, about having to relocate to Florida, and that a major customer was concerned about the discrepancy between the products described on the website and those Health-Chem claimed to produce.

On the other hand, an interrogatory on the verdict form indicates that the jury found that Aronowitz did not intend to infringe on Health-Chem's mark. We find no evidence in the record to controvert this finding. Accordingly this factor weighs in favor of Aronowitz. We agree with the district court that the remaining

four factors favor neither side.[6]  In consideration of all relevant factors, we

conclude that because the two most important factors in determining the likelihood

of confusion – type of mark and actual confusion – weighed in favor of finding

such confusion, there was sufficient evidence to support a reasonable jury's finding

of infringement.  Accordingly, the district court did not err in denying Aronowitz's

motion for judgment as a matter of law.[7]

4. *Damages for Infringement*

Aronowitz has also challenged the jury's $25,000 damages award as to

trademark infringement on the ground that Health-Chem has not demonstrated the

value of its mark, made use of its mark, or spent any money on corrective

advertising.  "Under the Lanham Act, damages for trademark infringement may

---

[6]None of the other four factors was extensively discussed by either party: (1) The issue is Aronowitz's use of the Health-Chem mark as it exists, so there is no issue of similarity.  (2) It could be argued that an average consumer of medical supplies might believe that the same manufacturer produced both transdermal pharmaceutical patches and home-use and other medical diagnostic tests. See E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc., 756 F.2d 1525, 1530 (11th Cir. 1985). On the other hand, it is not Health-Chem itself, but a subsidiary of a subsidiary, Hercon Laboratories, that actually manufactures the products.  (3) It is not clear from the record what similarities or differences might exist between customers or sales presentations of the two companies.  (4) The record also lacks substantial evidence of advertising media.

[7]Aronowitz also asserts that any confusion caused by his website was more likely due to the similarity between the names, "Health-Chem Diagnostics" and "Health-Chem," than to his use of the shorter "Health-Chem" mark.  Aronowitz, however, makes no legal argument in connection with this assertion, and it does not change the fact that his license was limited to use of the longer mark "Health-Chem Diagnostics" and the jury found, based on ample evidence in the record, a likelihood of confusion resulting from his use of the shorter mark.

include (1) the defendant's profits, (2) any damages sustained by the plaintiff, and (3) the cost of the action." Ramada Inns, Inc. v. Gadsden Motel Co., 804 F.2d 1562, 1564 (11th Cir. 1986) (citing 15 U.S.C. § 1117). Further, the Lanham Act confers upon district courts "wide discretion in determining a just amount of recovery for trademark infringement." Id. at 1564-65. Unlike in the case of future lost profits caused by breach of contract, "Lanham Act damages may be awarded even when they are not susceptible to precise calculations." Id. at 1565. Finally, as the jury was instructed, "damages sustained by the plaintiff" include "all elements of injury to the business of the trademark owner proximately resulting from the infringer's wrongful acts" such as the costs of corrective advertising or injury to business reputation or goodwill. Id. at 1564-65.

Brody testified that confusion engendered by Aronowitz's website among Health-Chem's customers and potential employees caused concern, which cost Health-Chem both time and money to explain away on an individual basis. He explained several specific corrective actions that could be used to address the problem generally. Based on his personal experience with Health-Chem and Hercon Laboratories, one of Health-Chem's manufacturing subsidiaries, he offered estimates of the cost of each such action: (1) developing a corrective website would cost between $10,000 and $25,000; running ads in trade publications would

cost between $15,000 and $20,000; and attending two or three industry trade shows to reestablish Health-Chem's identity in the market would cost between $50,000 and $75,000. Altogether, this results in a range of the cost of corrective advertising of between $75,000 and $120,000. We therefore conclude that there was more than sufficient evidence in the record for a jury to find that corrective advertising was necessary and to award at least $25,000 on that basis.

Even if this were not the case, as with the $2.6 million verdict for breach of contract, the verdict form contained no interrogatories to indicate how the jury calculated its damages award for trademark infringement. However, our review of the record reveals evidence of alternative bases for an award. In addition to the evidence and estimates provided for corrective advertising, there was also testimony regarding damage to Health-Chem's reputation and goodwill. Brody testified that some of Health-Chem's larger customers had expressed trepidation about the possibility of a continued relationship between Health-Chem and Aronowitz because of his association with a failed business. This testimony could have figured into the jury's consideration of the damages instruction it was given which called for assessment of any injury or loss to Health-Chem's reputation, goodwill, general business reputation, sales, or deception of customers, as well as corrective advertising.

23

The jury in this case awarded only a small percentage of the up to $120,000 requested by Health-Chem in connection with its trademark infringement claim. We find sufficient evidence in the record to support this award for corrective advertising or other damages.

B. <u>Permanent Injunction Against Use of "Health-Chem" Mark</u>

Finally, in connection with the trademark infringement claim, Aronowitz challenges the breadth of the permanent injunction imposed by the district court as part of its Amended Final Judgment. We review the issuance of permanent injunctions for abuse of discretion. <u>Simmons v. Conger</u>, 86 F.3d 1080, 1085 (11th Cir. 1996). Federal courts may grant permanent injunctions where infringement is found to have occurred in order to prevent further infringing use of a mark, and such injunctions should be designed to keep the former infringers "a safe distance away" from the protected mark. <u>See</u> <u>Howard Johnson Co. v. Khimani</u>, 892 F.2d 1512, 1517 (11th Cir. 1990).

Here, however, we have an unusual situation in which the mark at issue is part of a mark which Aronowitz has a license to use. Consequently, we find that the familiar boilerplate language "or any other marks similar to Defendant's trademark" used by the district court makes the injunction inappropriately broad in this case. R4-155 at 2. Accordingly, we vacate the permanent injunction as issued.

C. <u>Conditional Grant of a New Trial</u>

Now, because we reverse the district court's grant of judgment as a matter of law replacing the jury's $2.6 million verdict with $1 in nominal damages, but still find the $2.6 million verdict insufficiently legally supported to be reinstated, we come to the issue of how the claim for breach of the 2003 contract ought to be resolved upon remand. The district court granted Health-Chem's motion for a new trial in the alternative in case we reversed either of its judgments as a matter of law. Aronowitz challenges this grant but requests a new trial as to damages only.

Federal Rule of Civil Procedure 59 provides that a district court may grant a new trial "on all or part of the issues." Fed. R. Civ. Proc. 59(a). Rule 50 provides that a new trial granted in the alternative "shall proceed unless the appellate court has otherwise ordered." Fed. R. Civ. Proc. 50(c)(1). We review the grant of a new trial pursuant to Rule 59 for abuse of discretion. <u>Williams v. City of Valdosta</u>, 689 F.2d 964, 974 (11th Cir. 1982). Our review for abuse of discretion is "more rigorous when the basis" of the grant was the weight of the evidence. <u>Id.</u>

As we discussed in the context of judgments as a matter of law, courts are generally "not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." <u>Narcisse v. Illinois Cent. Gulf</u>

R.R., 620 F.2d 544, 548 (5th Cir. 1980). Accordingly, when there is error as to damages, but the jury has rendered a proper ruling as to liability, the appropriate remedy is to remand the case to the district court for either remittitur, see, e.g. Goldstein v. Manhattan Industries, Inc., 758 F.2d 1435, 1448 (11th Cir. 1985), or for a new trial exclusively as to the amount of damages, see e.g. Parker v. Scrap Metal Processors, Inc., 386 F.3d 993, 1018 (11th Cir. 2004) (reversing excessive jury award and remanding for new trial solely as to damages). See also Overseas Private Inv. Corp. v. Metro. Dade County, 47 F.3d 1111, 1116 (11th Cir. 1995) ("Because the liability issues were properly and clearly decided by the jury, the remedy in this instance is to remand the case to the district court for a new trial on the amount of damages only.").

Here, the district court conditionally granted a new trial in connection with the 2003 contract breach claim because it found the amount of the jury's verdict to be "against the overwhelming weight of the evidence" in that (1) the evidence was insufficient to support a causal connection between Health-Chem's breach of the 2003 contract and Aronowitz's lost royalties, and (2) "no yardstick was given to the jury that could be used to determine [Aronowitz's damages] with reasonable certainty . . . because [Aronowitz] offered insufficient evidence of [his] potential costs." R4-154 at 18. However, the district court declined to disturb the jury's

26

verdict as to liability on the underlying claim for breach. Our rigorous review of the record evidence in support of damages reveals no abuse of discretion. Accordingly, we affirm the district court's alternative grant of a new trial as to the sole remaining unresolved issue of damages in connection with breach of the 2003 contract.

### III. CONCLUSION

Aronowitz appeals the district court's order granting judgment as a matter of law in favor of Health-Chem as to breach of the 2002 contract, reducing damages as to breach of the 2003 contract to $1, and upholding the jury's verdict as to the trademark infringement claim against him. Because we find no error in the district court's conclusion that the 2003 contract constituted a novation of the 2002 Contract, thereby eliminating any possible claim for breach, we **AFFIRM** the judgment as a matter of law as to breach of 2002 contract. Because we find the $2.6 million damages award to be, in part, insufficiently legally supported by the evidence, we **REVERSE** the judgment as a matter of law reducing the award from $2.6 million to $1, and **REMAND FOR A NEW TRIAL AS TO DAMAGES** as to breach of the 2003 contract. Because we find that the record contains sufficient evidence for a reasonable jury to conclude that Health-Chem demonstrated both requirements for trademark infringement and to award $25,000 in damages, we

27

**AFFIRM** the district court's denial of Aronowitz's motion for judgment as a matter of law. Finally, we **VACATE** the permanent injunction issued by the district court because it is inappropriately broad.

CUDAHY, Senior Circuit Judge, concurring in part and dissenting in part:

I agree that the 2002 Contract was supplanted by the 2003 Contract and that Health-Chem's financial obligations under the former agreement were "terminated" when the new agreement took effect. There is no doubt that both parties wanted to get out of what they perceived to be a bad deal. I write separately, however, to clarify a matter I do not believe that the panel opinion squarely addresses: What happens to direct obligations between the contracting parties that resulted from transactions completed while the 2002 Contract was in effect and there was no 2003 Contract? As this question arises here, what is the status of debts already owed to Aronowitz by Health-Chem and recorded in the books?

The panel opinion deals clearly with this question insofar as it involves obligations to third parties: Goods or services delivered before the date of the 2003 Contract are to be the obligation of Health-Chem, while goods or services delivered after the 2003 Contract are to be the obligation of the recipient. But the panel opinion may be interpreted to assume that the 2003 Contract cancels and extinguishes even past debts between the parties not involving third parties. The opinion leans heavily on a clause from the 2003 Contract that states that it "terminates all financial obligations" of Health-Chem to Aronowitz, but in context

29

the meaning of this language is far from self-evident. I do not believe that the concept of "terminating" a contract necessarily implies the cancellation of debts already on the books. It is certainly a stretch to make that language also mean that all the royalties that Health-Chem owed Aronowitz under the 2002 contract are forgiven and need not be paid. That is the kind of language I would expect to see before concluding that debts, once owed, are now forgiven. The transactions in question are history; they are not to be undone by a new deal unless there is explicit language purporting to do so.

Contracts are generally prescriptions for the future, not the past. That is how I would interpret the 2003 Contract. I think that the effect of the "termination" language is to end the obligation to make further payments. In fact, this is what the parties stipulated. They expressly specified in the opening language of the 2003 Contract that the intent of the agreement was to "cease further funding" of the Diagnostics Division. This statement of intent should guide our interpretation of the "termination" clause. In fact, Health-Chem actually conceded throughout the litigation that it *still owed* Aronowitz money under the 2002 Contract for the prior use of his patents. Health-Chem did not claim that this debt had been extinguished; it simply disagreed about how much was owed. I see nothing to suggest that such debts have been cancelled by the 2003 Contract. Accordingly, I

30

would reverse the district court's judgment with respect to the 2002 beach of

contract claims but in all other respects I join the opinion of the panel.