[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 08-16179

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 07, 2010
JOHN LEY
CLERK

D.C. Docket No. 07-00556-CV-CC-1

CALIBER AUTOMOTIVE LIQUIDATORS, INC.,
a California corporation,

                               Plaintiff-Counter-Defendant-Appellant,

                    versus

PREMIER CHRYSLER, JEEP, DODGE, LLC, a Georgia corporation, d.b.a.
Premier Automotive Group, GWINNETT, LLC, a Florida corporation, d.b.a.
Premier Dodge, d.b.a. Premier Automotive Group, and SAM KAZRAN, a Florida
resident, a.k.a. Sam Khazrwan,

                               Defendants-Counter-Claimants-Appellees,
WHO'S CALLING, INC.,

                               Movant-Appellee.

Appeal from the United States District Court
for the Northern District of Georgia

(May 7, 2010)

Before BLACK, MARCUS and HIGGINBOTHAM,<sup>*</sup> Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

Caliber Automotive Liquidators, Inc. provides advertising promotions to car dealerships and owns service marks on "Slash-It! Sales Event" and "Slasher Sale." Premier Automotive Group uses its own marketing – an infomercial called the "Slasher Show" – to sell cars. Caliber sued Premier in the Northern District of Georgia under both federal and state law, claiming infringement. The district court granted Premier summary judgment, holding that no reasonable jury could find a likelihood of confusion between Caliber's marks and Premier's advertising. Caliber appealed. Persuaded that the district court erred in its measure of confusion of Caliber's customers by Premier's advertising and in the weight it gave an incontestible mark, we reverse and remand.

I.

Daniel Ryan owns and operates Caliber Automotive Liquidators, Inc., offering its services to car dealerships throughout the country.[1] Caliber's service follows a

---

\* Honorable Patrick E. Higginbotham, United States Circuit Judge for the Fifth Circuit, sitting by designation.

[1] Ryan has operated under the Caliber name for nearly twenty years, starting with Caliber Marketing, then Caliber Promotions, and now Caliber Automotive Liquidators.

regimen it developed to reduce quickly a dealer's existing inventory. Starting two weeks before a dealership's sale, Caliber assists in a saturation of the local market with radio, television, and print ads. In the days immediately before the sale, its team arrives on-site to prepare the dealership, putting up marketing paraphernalia and energizing the dealership's sales staff, as Caliber's staff do not act as floor salespersons. Instead, during the sale, the dealer's salespersons – performing for the customers – histrionically slash the car prices and seal the deals. Caliber enjoys a demand for its service, as its methods often help dealerships shrink inventory over three-day "blowouts."[2]

Caliber has held a federal registration for "Slash-It! Sales Event" since 1999. The registration[3] provides that the service mark[4] is used for "advertising agency services, namely, promoting the services of automobile dealerships through the distribution of printed and audio promotional materials and by rendering sales promotion advice." The Slash-It! Sales Event mark, in trademark parlance, is

---

[2] Three-day Caliber-run promotions are the standard, but the events can span anywhere from two to four days.

[3] Number 2,227,377.

[4] "A 'trademark' is . . . any word, name, symbol, or device or any combination thereof used by any person to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source [is] unknown. A 'service mark' is identical to a trademark in all respects except that it is intended to indicate the origin of services, rather than goods." *Univ. of Fla. v. KPB, Inc.*, 89 F.3d 773, 776 n.4 (11th Cir. 1996) (citation and quotation marks omitted).

3

"incontestible," a status we will come to.[5] Caliber also owns a federal registration[6] for the service mark "Slasher Sale," which the company purchased in 2005.[7] Daniel Ryan scours the country's automotive advertisements to ensure that no car dealer uses the slasher marks. Ryan has stopped hundreds of would-be infringers, sells a license to use both Slash-It! Sales Event and Slasher Sale, and has favorably settled several nascent legal actions against alleged infringers.

In the summer of 2006, Ryan learned that Premier Automotive Group, owned by Sam Kazran, was running infomercials called Slasher Shows for its dealerships in greater Atlanta, advertising drastically reduced-priced vehicles. The public could not buy cars through the infomercial, but instead had to come to the showroom. In addition to the Slasher title, the infomercial featured a Slasher Countdown, a Slasher Man complete with slasher jewelry, off-camera voices screaming "slash it," and on camera uses of the term "slash it." Premier also highlighted the Slasher Show theme on its website.

To Ryan's eyes, the Slasher Show infringed Caliber's marks. More

---

[5] *See* 15 U.S.C. § 1065.

[6] Number 2,757,593.

[7] Ryan bought the Slasher Sale mark from Vincent Sanchez, but yet another man, Brian Story, also claimed rights over the Slasher Sale idea. The three have come to an understanding over the use of the term, and, for our purposes, Caliber owns the service mark. Ryan claims to have used Slasher Sale since the late 1990s, when he came up with the idea.

significantly, the infomercial perplexed its customers. Caliber over the years had done business with various Bill Heard Dealerships, each located in Georgia. Mark Henry, general manager of a Heard dealership, saw the Slasher Show and became upset. He was under the impression that Caliber had granted Heard exclusive use of slasher sales in Georgia, that the show for Premier breached that agreement. John Sumner, formerly general manager of a couple of Heard dealerships, was angered by a radio version and a TV episode of the Slasher Show, thinking that Caliber had violated the exclusive license by doing the show for Premier. Responding to the perceived duplicity, Sumner canceled Caliber-run Slash-It! Sales Events at his Union City, Georgia dealership and ordered his workforce not to pay Caliber's invoices.[8]

## II.

Ryan called Kazran to work out a licensing agreement. Kazran responded that he commanded an "army of lawyers," ending the conversation with rude comments. Caliber filed suit in federal court, alleging: (1) infringement under the Lanham Act;[9]

_____

[8] A few persons who were not Caliber customers were also confused. Upon seeing the infomercial, Bill Ryan, Daniel's brother, and the girlfriend of one of Caliber's employees each thought Caliber had produced the show.

[9] 15 U.S.C. § 1114.

(2) false designation of origin under the Lanham Act;[10] (3) deceptive trade practices under Georgia law;[11] (4) unfair competition under Georgia law;[12] and (5) dilution of trademark under Georgia law.[13] Premier moved for summary judgment, arguing that no reasonable jury could find infringement, and the district court agreed.

The court started with a correct observation that: "A successful cause of action for trademark infringement requires the evidence to establish that the infringer 1) used the mark in commerce, without consent; and 2) that the use was likely to cause confusion."[14] Our focus is upon the element of confusion. The district court properly identified the seven-factor weighted balancing test "to be considered as to the likelihood of confusion: (1) type of mark; (2) similarity of mark; (3) similarity of the products the marks represent; (4) similarity of the parties' retail outlets and customers; (5) similarity of advertising media; (6) defendant's intent; and (7) actual confusion. Of these, the type of mark and the evidence of actual confusion are the

---

[10] 15 U.S.C. § 1125.

[11] GA. CODE ANN. § 10-1-371 *et seq.*

[12] GA. CODE ANN. § 23-2-55 *et seq.*

[13] GA. CODE ANN. § 10-1-451(b).

[14] *Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1239 (11th Cir. 2008).

most important."[15]

The court concluded that: the similarity of the marks and "slight" actual confusion weighed in favor of likelihood of confusion; similarity in advertising did not tip the balance either way; and the strength of mark, similarity of events, similarity of sales method, and defendants' intent all weighed against likelihood of confusion. Tallying the score, the district court found that no reasonable jury could find likelihood of confusion, and granted summary judgment to Premier on the trademark infringement claim under 15 U.S.C. § 1114.

Because the false designation of origin claim under 15 U.S.C. § 1125 and the Georgia-law claims for deceptive trade practices and unfair competition all pivoted upon the same likelihood of confusion test, the district court also granted summary judgment on those claims.[16] Finally, the district court granted Premier summary

---

[15] *Id.* (citing *Frehling Enters. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999)) (quotation marks omitted).

[16] The likelihood of confusion test applies to both causes under the Lanham Act – infringement and false designation of origin. *See Ross Bicycles, Inc. v. Cycles USA, Inc.*, 765 F.2d 1502, 1503–04 (11th Cir. 1985) ("To prevail on a false designation of origin claim under 15 U.S.C. § 1125(a) a plaintiff must establish that the defendant adopted a mark confusingly similar to the plaintiff's mark such that there was a likelihood of confusion as to the origin of the goods. The factors relevant to establishing this are identical to the factors relevant to establishing a likelihood of confusion with respect to trademark infringement under 15 U.S.C. § 1114." (citation omitted)). Similarly, a plaintiff must establish likelihood of confusion to prevail on a deceptive trade practices claim under GA. CODE ANN. § 10-1-371 *et seq. See Kason Indus. v. Component Hardware Group*, 120 F.3d 1199, 1203 (11th Cir. 1997) ("[Georgia deceptive trade practices law] provides a cause of action when a person, 'in the course of his business, vocation, or occupation . . . [c]auses likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods

judgment on Caliber's Georgia-law trademark dilution claim, because Caliber has no registered Slasher mark on file in the state of Georgia – a prerequisite for recovery.[17]

Caliber appealed, focusing on two arguments. First, the district court acknowledged evidence of actual confusion of Caliber's customers but devalued it, because the Slasher Show did not confuse Premier's retail customers. Caliber urges that this was error. Second, Caliber asserts that the district court understated the strength of its marks. With these factors weighing in favor of likelihood of confusion, the argument goes, a reasonable jury could find for Caliber – making summary judgment improper.

---

or services.' It should be apparent that . . . the Lanham Act and [the Georgia deceptive trade practices law] provide analogous causes of action governed by the same standard." (citing GA. CODE ANN. § 10-1-372)). The caselaw is not as clear on whether the likelihood of confusion test applies wholesale in unfair competition claims under GA. CODE ANN. § 23-2-55 *et seq.*, but "[t]he district court held that the Georgia . . . unfair competition count[ ] involved the same dispositive question as the federal Lanham Act count[s]. This is a question of state law that the parties do not challenge on appeal. Therefore, we treat this . . . as correct." *Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 716 F.2d 833, 839 (11th Cir. 1983) (footnote omitted); *see also Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1539 n.11 (11th Cir. 1985); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 258 (5th Cir. 1980) ("Infringement of a registered mark is governed by the provisions of 15 U.S.C. § 1114[ ], which imposes liability against use likely to cause confusion, or to cause mistake, or to deceive. The same test is applicable to the [Georgia] deceptive trade practices claim and common law unfair competition." (citations and alterations omitted)).

[17] "[T]he statutory protection of OCGA § 10-1-451 is available only upon registration of a trade name with the Secretary of State." *Elite Pers., Inc. v. Elite Pers. Servs., Inc.*, 259 Ga. 192, 193, 378 S.E.2d 117, 119 (Ga. 1989), *overruled on other grounds by Future Prof'ls, Inc. v. Darby*, 266 Ga. 690, 470 S.E.2d 644 (Ga. 1996).

III.

"We review de novo a district court's grant of summary judgment. Summary judgment is proper only if the record before the district court shows that there is no genuine issue as to any material fact and [Premier] is entitled to judgment as a matter of law. We must view the evidence in the light most favorable to [Caliber], rather than weighing the evidence ourselves or making credibility determinations."[18]

A.

All parties concede that evidence of actual confusion is the most weighty consideration.[19] The district court analyzed the evidence of actual confusion of two audiences: (1) Caliber's car dealership customers and (2) car-buying retail customers. Although the district court found that Caliber's patrons were confused, it offset this evidence with the fact that the car-buying public was not. In the end, the court found an overall "slight" amount of actual confusion.

On appeal, Caliber challenges the district court's focus on the car-buying public, the customers who frequent Premier's showrooms, understandably because the type of confusion was a heavy stone in the balance. We have explained that

[18] *Welding Servs. v. Forman*, 509 F.3d 1351, 1356 (11th Cir. 2007) (citations omitted).

[19] *See*, *e.g.*, *Alliance Metals, Inc. of Atlanta v. Hinely Indus.*, 222 F.3d 895, 907 (11th Cir. 2000); *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 978 (11th Cir. 1983) ("Although evidence of actual confusion is not necessary to a finding of likelihood of confusion, it is nevertheless the best evidence of likelihood of confusion." (quotation marks omitted)).

"[p]erhaps as important as . . . the number of instances of confusion are the kinds of persons confused and degree of confusion. Short-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight while confusion of actual customers of a business is worthy of substantial weight."[20]

There is more. We have specified that "[a]ctual *consumer* confusion is the best evidence of likelihood of confusion."[21] This circuit's caselaw makes plain that the consumers of the relevant product or service, especially the mark holder's customers, turn the key.[22] All potential consumers of the relevant product or service, including

---

[20] *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1167 (11th Cir. 1982) (citation omitted); *see also Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1239–40 (11th Cir. 2008) ("With regard to actual confusion, we have specifically accorded 'substantial weight' to evidence that actual customers were confused by the use of a mark as opposed to other categories of people." (citing *Safeway Stores, Inc.*)).

[21] *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1543 (11th Cir. 1986) (emphasis supplied); *see also Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 122 F.3d 1379, 1382 (11th Cir. 1997) (mentioning "actual consumer confusion").

[22] *See Alliance Metals, Inc.*, 222 F.3d at 908 (focusing on confusion of industrial aluminum buyers – including the mark holder's customers – in the context of an infringement dispute between aluminum distributors); *Safeway Stores, Inc.*, 675 F.2d at 1167; *see also Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 650 (11th Cir. 2007) (citing *United States v. Torkington*, 812 F.2d 1347, 1352 (11th Cir. 1987) (explaining that in Lanham Act cases the audience for the likelihood of confusion test "includes individuals who are potential purchasers of the trademark holder[']s goods as well as those who are potential direct purchasers of the allegedly counterfeit goods.")); *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 832 & n.17 (11th Cir. 1982). *Conagra, Inc. v. Singleton* is another particularly illustrative case. 743 F.2d 1508 (11th Cir. 1984). The plaintiff ran a seafood packing operation under the name Singleton. The defendant ran a shrimping business under the same name. Plaintiff sued for infringement and put on proof that its customers – food wholesalers – became confused when the defendant entered the market as a competitor, selling directly to restaurants. The court focused on the type of people most likely to become confused – the mark holder's "customers and people in the seafood trade." *Id.* at 1515.

10

middlemen, can inform the inquiry, and the ultimate consumers deserve special attention.[23]

In this case, advertising and promoting represent the services. As car dealerships, not the general public, purchase slasher promotions, it is unremarkable that a retail customer of a dealer would be unfamiliar with Caliber. Confusion of persons casually acquainted with a business carry little weight. At the same time, Caliber has proffered competent summary judgment evidence of actual confusion of the car dealerships, the relevant purchasing population. Here, "the people confused are precisely those whose confusion is most significant."[24]

Caliber asks the court to create a bright-line rule precluding summary judgment when the plaintiff in an infringement action presents an instance of actual confusion, asserting that the rule would bring the Eleventh Circuit into line with the Ninth.[25] This court's caselaw forecloses such a binary rule. Rather, there "is no absolute scale as to how many instances of actual confusion establish the existence of that factor. . . . [T]he court must evaluate the evidence of actual confusion in the light of the

---

[23] *See, e.g., John H. Harland Co.*, 711 F.2d at 979 & n.22.

[24] *Safeway Stores, Inc.*, 675 F.2d at 1167.

[25] *See Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1127 (9th Cir. 2004) (suggesting that evidence of actual confusion "alone probably precludes summary judgment").

11

totality of the circumstances involved."[26]  Similarly we have held that merely one instance of actual confusion did not militate in favor of finding likelihood of confusion.[27]

While we have no hard-and-fast rule, under our standard "the quantum of evidence needed to show actual confusion is relatively small."[28]  Viewing the summary judgment record in a light most favorable to Caliber, it has shown actual confusion.[29]  The district court erred by overvaluing lack of confusion exhibited by the general public, an audience with no experience in the advertisement-buying market.

B.

---

[26] *AmBrit, Inc.*, 812 F.2d at 1543.

[27] *Frehling Enters. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1341 (11th Cir. 1999) ("Thus, in light of the reasoning in *Safeway Stores* – that the confusion of someone very familiar with the enterprise (like the professional buyer in the instant case) is relevant evidence of actual confusion – we conclude that the above incident was at least sufficient to raise an inference of actual confusion, but we conclude that the outcome as to this factor is not sufficiently dispositive so as to favor either side in an appreciable fashion.").

[28] *Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 716 F.2d 833, 845 (11th Cir. 1983); *see also Safeway Stores, Inc.*, 675 F.2d at 1167 (holding that two instances of actual confusion were sufficient evidence of actual confusion to be worthy of some consideration); *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971) ("[R]eason tells us that while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof.").

[29] Although the instances of actual customer confusion only number two, the confusion is not "minimal."  *But see Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir. 1980) (finding three instances of actual confusion insufficient).  Car dealerships comprise but a small audience, and those confused in this case represent a large portion of Caliber's Georgia business.

When considering the type of marks, the second most important factor in the balance,[30] the district court held that Caliber's were relatively weak, descriptive with no secondary meaning, rejecting Caliber's contention that its marks are relatively strong.

"There are four recognized types of mark, ranging from weakest to strongest: generic, descriptive, suggestive and arbitrary. The stronger the mark, the greater the scope of protection accorded it."[31] "An arbitrary or fanciful mark bears no logical relationship to the product or service it is used to represent [e.g., Kodak]. A suggestive mark refers to some characteristic of the goods, but requires a leap of the imagination to get from the mark to the product [e.g., Penguin Refrigerators]. A descriptive mark identifies a characteristic or quality of the service or product [e.g., Vision Center]."[32]

Caliber's marks are, at a minimum, descriptive. The dispute centers on the strength of descriptive marks. Along the spectrum from generic to arbitrary, descriptive marks fall on the weaker end. Indeed, "[a] descriptive mark . . . is

---

[30] *Custom Mfg. & Eng'g, Inc. v. Midway Servs.*, 508 F.3d 641, 650 (11th Cir. 2007) ("We have consistently held . . . that the type of mark and evidence of actual confusion are the most weighty of considerations." (quotation marks and alteration omitted)).

[31] *Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1240 (11th Cir. 2008) (citation and quotation marks omitted).

[32] *Welding Servs. v. Forman*, 509 F.3d 1351, 1357–58 (11th Cir. 2007) (citations omitted).

protected only when secondary meaning is shown."[33]  A service mark develops

secondary meaning when the consuming public associates the services with a

particular provider.[34]

Caliber urges incontestible marks like Slash-It! Sales Event do have secondary

meaning, and are hence strong marks.  In *Dieter v. B & H Industries of Southwest*

*Florida*, this court held that "incontestable status is a factor to be taken into

consideration in likelihood of confusion analysis.  Because [a] mark is incontestable,

then it is presumed to be at least descriptive with secondary meaning, and therefore

a relatively strong mark."[35]  Slash-It! Sales Event has attained federal incontestible

status, so here, as in *Dieter*, the district court erred in holding that the mark was

---

[33] *Univ. of Ga. Athletic Ass'n. v. Laite*, 756 F.2d 1535, 1540 (11th Cir. 1985) (citing *Sun Banks of Fla., Inc. v. Sun Fed. Savings & Loan Ass'n*, 651 F.2d 311, 315 (5th Cir. 1981)).

[34] *See Welding Servs.*, 509 F.3d at 1358 ("A descriptive name . . . can acquire distinctiveness or 'secondary meaning' by becoming associated with the proprietor's product or service.  A name has acquired secondary meaning when the primary significance of the term in the minds of the consuming public is not the product but the producer." (citing *Am. Television & Commc'n Corp. v. Am. Commc'ns & Television, Inc.*, 810 F.2d 1546, 1548–49 (11th Cir. 1987)) (quotation marks and alterations omitted)).  "Descriptive terms may not be registered as trademarks under the Lanham Act, unless the holder shows that the mark has acquired secondary meaning.  Proof of secondary meaning in a trademark requires a showing that the mark has become distinctive of the trademark holder's product.  Five years after registering a mark, the holder may file the affidavit . . . and have its mark declared 'incontestable.'  Once a mark has become incontestable, its validity is presumed . . . .  Once a mark has achieved incontestable status, its validity cannot be challenged on the grounds that it is merely descriptive, even if the challenger can show that the mark was improperly registered initially."  *Dieter v. B & H Indus. of Sw. Fla.*, 880 F.2d 322, 328 (11th Cir. 1989) (citations and quotation marks omitted).

[35]  880 F.2d at 329.

merely descriptive, and not entitled to strong protection. Moreover, Premier does not point to evidence to counter the evidence of confusion.[36] Rather, Premier argues that it was not its burden to do so, staking an untenable legal position.

C.

This court has upheld a jury verdict for the plaintiff in an infringement case where the only two factors favoring likelihood of confusion were evidence of (1) a strong mark and (2) actual confusion.[37] We explained: "[B]ecause the two most important factors in determining the likelihood of confusion – type of mark and actual confusion – weighed in favor of finding such confusion, there was sufficient evidence to support a reasonable jury's finding of infringement."[38] Sensitive to the cautions that the seven-factor test "entails more than the mechanistic summation of the number of factors on each side . . . [and] involves an evaluation of the overall balance" and

---

[36] *Investacorp, Inc. v. Arabian Inv. Banking Corp.*, 931 F.2d 1519, 1526 (11th Cir. 1991) (noting that "instances of consumer confusion are probative of secondary meaning"); *see also Commerce Nat'l Ins. Servs. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 440 (3d Cir. 2000) ("[E]vidence of actual confusion is . . . one factor in the secondary meaning analysis . . . ." ); *Tools USA & Equip. Co. v. Champ Frame Straightening Equip., Inc.*, 87 F.3d 654, 660 (4th Cir. 1996) ("Evidence offered as to actual customer confusion, although also probative of likelihood of confusion, certainly tends to show that the relevant purchasing public associated [plaintiff's product] with [plaintiff].").

[37] *Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1239–40 (11th Cir. 2008).

[38] *Id.* at 1240.

that "a court must also take into account the unique facts of each case,"[39] we will review the remaining five factors.

i.

When analyzing the similarity of the mark, the court must consider "the overall impression created by the marks, including a comparison of the appearance, sound and meaning of the marks, as well as the manner in which they are displayed."[40] The Slash-It! Sales Events, Slasher Sales, and Slasher Show use the word "slash" to cut prices on cars. As the district court found, Caliber has created a disputed issue of material fact that the slasher slogans leave the same impression, weighing in favor of likelihood of confusion.

ii.

Analyzing the similarity of the products the marks represent "requires a determination as to whether the products are the kind that the public attributes to a single source, not whether or not the purchasing public can readily distinguish

---

[39] *Custom Mfg. & Eng'g, Inc. v. Midway Servs.*, 508 F.3d 641, 649–650 (11th Cir. 2007) (citing *Frehling Enters. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1342 (11th Cir. 1999); *Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 716 F.2d 833, 840 n.17 (11th Cir. 1983)) (quotation marks omitted).

[40] *E. Remy Martin & Co. v. Shaw-Ross Int'l Imps., Inc.*, 756 F.2d 1525, 1531 (11th Cir. 1985).

between the products of the respective parties."[41]  The district court saw this factor as weighing against likelihood of confusion, finding dispositive that: (1) the Slasher Show plays on television while the Slash-It! sales are live events; (2) Slasher Show customers cannot during the show test drive cars but Slash-It! event customers can; (3) Slash-It! uses print media where Slasher Show does not; and (4) Slash-It! events often involve painting car windows with a "was" price so that salesmen can "slash" it and write in a "now" price.  Despite these differences, the district court conceded several likenesses: (1) crowds at both sales chant "slash it;" (2) both sales market automobiles; and (3) both sales drastically reduce purchase prices.  As we see it, the similarities go to the heart of these promotions, whereas the differences might be seen as arising only at the periphery.  We are mindful that "the test [is] not whether the goods could be distinguished . . . but whether the goods are so related in the minds of consumers that they get the sense that a single producer is likely to put out both goods."[42]  At the least, the similarities between the two sales allow for the inference that "a reasonable consumer could possibly attribute the products here to the same source."[43]

---

[41] *Frehling Enters.*, 192 F.3d at 1338.

[42] *Id.* (citing *E. Remy Martin & Co.*, 756 F.2d at 1530).

[43] *Id.*

17

iii.

The similarity of the parties' retail outlets and customers "takes into consideration where, how, and to whom the parties' products are sold."[44] The district court found this factor to weigh against likelihood of confusion. We disagree. By imputing a sale of a slasher campaign from Premier to its dealerships, we can see that both parties sell a marketing ploy to car dealers. Caliber sells to entities looking to outsource their marketing, Premier decided not to outsource its promotional ideas but to do them in-house. Promoting is the service and car dealerships the consumers.

iv.

The similarity of advertising media "factor looks to each party's method of advertising."[45] This is difficult to analyze, because the allegedly infringed service is itself advertising. The district court found the overall weight neutral. We agree that the prong here adds little.

v.

When analyzing an alleged infringer's intent, we must determine whether the defendant "adopted a plaintiff's mark with the intention of deriving a benefit from the

---

[44] *Id.* at 1339.

[45] *Id.*

plaintiff's business reputation."[46]  Caliber alleges that Kazran's barrage of foul language when Ryan asked him to stop using the marks evidences a maligned intent. We agree with the district court that this is little evidence of Premier's intent when it allegedly adopted the Slasher marks.  Rather, the rudeness reflects contempt for the strength of the service marks.  Caliber also suggests that some of Premier's employees have carried over from a dealership's previous management, one which had bought a Slash-It! Sales Event, intimating that these employees stole the Slasher concept from Caliber.  The district court rightly found that Caliber has failed on this factor to raise a genuine issue of material fact, weighing against a finding of likelihood of confusion.

## IV.

Caliber has presented sufficient evidence of the strength of its marks and of actual confusion amongst the relevant consumer class to avoid summary judgment. Although it may be decided as a matter of law, "likelihood of confusion generally is a question of fact,"[47] and Caliber explicitly "stops short of asking this Court to rule that infringement [occurred]."  Caliber, instead, seeks a remand for trial.  We reverse

---

[46] *Id.* at 1340.

[47] *Alliance Metals, Inc. v. Hinely Indus., Inc.*, 222 F.3d 895, 907 (11th Cir. 2000) (citing *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1514–15 (11th Cir. 1984)).

19

and remand for further proceedings consistent with this opinion, including trial. Caliber does not in its brief challenge the adverse judgment on its dilution of trademark claim under Georgia law,[48] which the district court did not base on a likelihood of confusion. We deem issues not clearly briefed on appeal to be abandoned[49] and leave the state-law dilution of trademark portion of the judgment undisturbed.

REVERSED and REMANDED.

---

[48] GA. CODE ANN. § 10-1-451.

[49] *APA Excelsior III L.P. v. Premiere Techs.*, 476 F.3d 1261, 1270 & n.4 (11th Cir. 2007).