[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 19-13285

_____

WREAL, LLC,
a Florida limited liability company,

Plaintiff-Appellant,

*versus*

AMAZON.COM, INC.,
a Delaware corporation,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

D.C. Docket No. 1:14-cv-21385-JAL

_____

Before WILSON, LAGOA, and BRASHER, Circuit Judges.

LAGOA, Circuit Judge:

This appeal asks us to address the doctrine of reverse-confusion trademark infringement.  Reverse confusion is not a standalone claim in trademark law; rather, it is a theory of how trademark infringement can occur.  In reverse-confusion cases, the plaintiff is usually a commercially smaller, but more senior, user of the mark at issue.  The defendant tends to be a commercially larger, but more junior, user of the mark.  The plaintiff thus does not argue that the defendant is using the mark to profit off plaintiff's goodwill; instead, the plaintiff brings suit because of the fear that consumers are associating the plaintiff's mark with the defendant's corporate identity.  It is this false association and loss of product control that constitutes the harm in reverse-confusion cases.

In this case, the plaintiff is Wreal, LLC, a Miami-based pornography company, which has been using the mark "FyreTV" in commerce since 2008.  The defendant is Amazon.com, Inc., the largest online purveyor of goods and services in the United States,

which has been using the mark "Fire TV" (or "fireTV") in commerce since 2012. Wreal does not claim that Amazon, by using the "Fire TV" mark, is attempting to profit off Wreal's good name, as would be typical in a forward-confusion case. Instead, Wreal contends that Amazon's allegedly similar mark is causing consumers to associate its mark—"FyreTV"—with Amazon.

The resolution of this appeal turns on the likelihood of confusing Amazon's "Fire TV" with Wreal's "FyreTV." In forward-confusion cases, we determine likelihood of confusion by applying a well-established seven-factor test. See Welding Servs, Inc. v. Forman, 509 F.3d 1351, 1360 (11th Cir. 2007). Applying those seven factors, the district court found that consumers were unlikely to confuse "Fire TV" with "FyreTV" and granted summary judgment to Amazon on Wreal's trademark infringement claims.

We have not had the opportunity to delineate how this seven-factor test applies in reverse-confusion cases. As discussed below, there are several important differences in how the seven likelihood-of-confusion factors apply in reverse-confusion cases versus forward-confusion cases. When applied specifically to the issues presented here, we conclude that the district court erred in granting summary judgment and should have allowed the case to proceed to trial. We therefore reverse the district court's order.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Wreal, LLC, and FyreTV

Wreal is a "Miami-based technology company that was formed in 2006 with the goal of developing a platform for streaming [pornographic] video content over the internet." *Wreal, LLC, v. Amazon.com, Inc.* (*Wreal I*), 840 F.3d 1244, 1246 (11th Cir. 2016). In 2007, Wreal launched "FyreTV," an online streaming service that Wreal markets as the "Netflix of Porn," "The Ultimate Adult Video On Demand Experience," and a "porn pay per view service." That same year, Wreal began using in commerce the marks "FyreTV" and "FyreTV.com"[1]—the latter of which represents the website where users can access the FyreTV service. *See id.* In order to access the FyreTV service, potential consumers must first go to FyreTV.com to sign up for an account. Once on the website, potential consumers must first verify they are at least eighteen years old and interested in viewing adult content before accessing the homepage, which displays several rows of pornographic images.

In order to make accessing its FyreTV service easier, Wreal also sells a set-top box,[2] called the FyreBoXXX, which allows consumers to access FyreTV on their television sets. To purchase a

---

[1] On October 14, 2008, Wreal registered both of its marks—"FyreTV" and "FyreTV.com"—with the U.S. Patent and Trademark Office. *Wreal I*, 840 F.3d at 1246.

[2] A "set-top box" is "a device that is connected to a television so that the television can receive digital signals." *Set-top Box*, *Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/set-top%20box (last visited June 19, 2022).

FyreBoXXX, a potential consumer must first travel to the FyreTV.com site and set up an account. In fact, the FyreBoXXX has never been sold in any store or website save for the online store at FyreTV.com. Between October 2012 and April 2014, Wreal suspended sales of the FyreBoXXX on its website. Indeed, by the end of 2012, Wreal had suspended all forms of print, radio, trade show, and television advertising for either the FyreBoXXX or FyreTV—Wreal's only two products. As of today, Wreal advertises its products only on other adult websites.

Apart from the FyreBoXXX and FyreTV.com, Wreal's customers also have other methods available to access the FyreTV service. For example, both Apple TV and Roku—two commercial set-top boxes that offer a host of general interest channels and media—support FyreTV. Thus, after signing up for an account at FyreTV.com, Wreal's customers can watch its content from their television set through a computer, a smartphone, a FyreBoXXX, an Apple TV, or a Roku.

## B. Amazon and "fireTV"

Amazon is the largest online purveyor of goods in the United States. In 2011, Amazon "started using the mark 'Fire' in connection with its Kindle tablets . . . to highlight the new model's ability to stream video over the internet." *Id.* at 1247. In late 2012 and early 2013, Amazon was gearing up to launch several new products, including a phone, a new tablet, and a set-top box. *Id.* It decided to use the "Fire" brand, as well as its housemark, "amazon," on these products, with the set-top box being called

"fireTV."[3]  *Id.*  During its branding discussions for the set-top box, Amazon learned about Wreal and its FyreTV products, but it never contacted Wreal about the set-top box's name and decided to use the "Fire" mark without Wreal's knowledge.  *Id.*

Amazon launched fireTV in April 2014 with a nationwide advertising campaign covered by major magazines and television networks.  The fireTV is a streaming-only set-top box; it does not contain a DVD tray and cannot play DVDs.  Amazon markets the product as a set-top box for general interest content, including "instant access to Netflix, Prime Instant Video, WatchESPN," and more.  It is not marketed as a device for streaming pornography.  Amazon advertises the device on amazon.com, as well as on television, in print media, and using in-store displays at retailers like Best Buy and Staples.  When Amazon began its search-engine-optimization efforts (to help fireTV appear on the internet), it bought ads for keywords related to fireTV, but not for FyreTV or anything related to pornography.  Often—but not always—Amazon will market its "Fire" products with its housemark, "amazon."  In the graphics and advertisements for the device, the device is

---

[3] The record shows that Amazon has alternatively used "Fire TV" or "fireTV" in its graphics and advertisements for its set-top box.  For purposes of this opinion, we use the stylization of "fireTV," because Wreal highlighted the inconsistency in its response disputing Amazon's statement of undisputed facts.  However, we emphasize that we make no ultimate conclusion on whether Amazon's mark is stylized as "Amazon Fire TV" or "fireTV."

sometimes referred to as one word, i.e., "fireTV," and sometimes it appears as two words, i.e., "Fire TV."

Amazon's fireTV does not broadcast any hardcore pornographic material.[4] But the fireTV does have apps for Showtime and HBO GO, and both of those content providers broadcast softcore pornography as part of their after-hours programming. It is unclear, however, whether those providers had any such material on their apps that link to fireTV at the time of the lawsuit.

It is undisputed that Amazon's policies for Amazon Prime Instant Video, which is Amazon's own streaming service and streams on the fireTV, prohibit the sale and consumption of hardcore pornography on the set-top box. However, the record evidence suggests that hardcore pornographic DVDs are available for purchase on amazon.com. The record evidence also suggests that two films with highly suggestive names were available for streaming on the fireTV through Amazon Prime Instant Video, though the record does not establish whether those films would be categorized as hardcore or softcore pornography.

---

[4] Generally, hardcore pornography refers to "scenes of actual sex acts." *Hardcore, Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/hard-core (last visited June 19, 2022). Softcore pornography refers to "scenes of sex acts that are less explicit than hard-core material." *Soft-core, Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/soft-core (last visited June 19, 2022).

8                    Opinion of the Court                19-13285

Moreover, Amazon does not advertise the fireTV on any pornographic websites and, as such, there is no overlap between the marketing schemes for FyreTV and fireTV. Nor does Amazon sell the fireTV on any pornographic websites. Thus, there is no overlap of the sales outlets utilized by Amazon and Wreal.

## C. Evidence of Confusion

In order to prevail on its trademark claims, Wreal must show a "likelihood of confusion." *Forman*, 509 F.3d at 1360. We therefore summarize the record evidence relevant to this issue, as presented by Wreal at the preliminary injunction hearing[5] and by both parties as part of their summary judgment briefing. Below are screenshots of the marks at issue as they appear in internet advertising for the set-top boxes:

---

[5] Wreal argues that the magistrate judge (and, by its adoption of the report and recommendation, the district court) erred when it considered, for purposes of summary judgment, evidence that was introduced by Wreal during the preliminary injunction hearing but that was not produced during subsequent discovery. This includes a consumer survey conducted by Wreal's expert, Dr. Thomas Maronick. Wreal is incorrect in this assertion. Evidence introduced at a preliminary injunction hearing becomes part of the record, and it is properly before the district court and may be considered when ruling on motions for summary judgment. *See Clinkscales v. Chevron U.S.A., Inc.*, 831 F.2d 1565, 1570 (11th Cir. 1987) ("The affidavits appended to appellant's motion for a preliminary injunction were, however, part of the written record before the district judge at the time he ruled on the summary judgment motions. These affidavits were therefore properly before the district court."). And Federal Rule of Civil Procedure 56(c)(3) allows a district court to consider any record evidence when ruling on summary judgment motions.





As noted above, the two products are neither advertised nor sold in the same outlets. A consumer cannot buy a fireTV at the same place where he could buy a FyreTV, and vice versa. Thus, no consumer will come across the products or marks in the same location—whether over the internet or in person at a brick-and-mortar location—save for an internet search engine like google.com. Additionally, Wreal's own evidence supports the proposition that mine-run internet consumers would not confuse Amazon's amazon.com website with Wreal's FyreTV.com website.

Over the course of the litigation, both Wreal and Amazon sought to present evidence relevant to the issue of actual consumer

confusion.  Amazon, for its part, produced in discovery "tens of thousands" of customer service inquiries related to the fireTV.  In one of those inquiries, an Amazon customer asked whether he could access adult content on the Amazon "fyreTV."[6]  Wreal points to record evidence showing a number of customer service inquiries it received in which customers asked Wreal if the FyreTV streaming service would be available on Amazon's fireTV set-top box.  Significantly, Wreal also produced in discovery a tweet directed to Wreal's Twitter account in which the sender asked, "Did you guys just merge with Amazon?"

Both parties also presented expert testimony regarding the level of confusion between the marks—Wreal at the preliminary injunction hearing and Amazon at the summary judgment stage. Amazon's expert, Dr. Dan Sarel, conducted a consumer survey that

---

[6] The district court adopted the magistrate judge's determination that, while this inquiry appears to show confusion, the sender was not confused.  The magistrate judge based its conclusion solely on the text of the inquiry itself, and not on any other record evidence.  In other words, the magistrate judge (and, by adoption, the district court) did not believe that the sender was confused.  Credibility determinations like this, however, are inappropriate at the summary judgment stage.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").  Here, for example, a reasonable juror could view the same evidence and come to the opposite conclusion reached by the magistrate judge and the district court.  Because this credibility determination improperly invaded the province of the jury, it must be disregarded.

showed a "confusion rate of one percent," which he described as "statistically insignificant" and "nonexistent." That conclusion was bolstered by Wreal's own expert—Dr. Thomas Maronick—who conducted his own consumer surveys in April 2014 and testified at the preliminary injunction hearing that he found "very low" levels of consumer confusion.[7]

### D. Procedural History

Wreal filed this lawsuit against Amazon about two weeks after the fireTV's product launch. In its complaint, Wreal sought treble damages and injunctive relief for reverse-confusion trademark infringement under the Lanham Act, the Florida Deceptive and Unfair Trade Practices Act, and Florida common law.[8] Five

---

[7] Wreal complains about both studies, arguing that the Amazon study was conducted too early to be relevant to the issue of consumer confusion and that its own study was conducted for a separate purpose altogether. Absence of evidence for a proposition, however, is not affirmative evidence to the contrary. And the only survey evidence available to us is not in dispute—both surveys show that there was no consumer confusion. Nevertheless, we accord this evidence relatively little weight, as "[t]his Circuit . . . has moved away from relying on survey evidence" in trademark cases. *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1341 n.5 (11th Cir. 1999).

[8] As noted by the district court, the protection that these three bodies of law provide is coextensive. *See Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 802 (11th Cir. 2003) ("[T]he analysis of the Florida statutory and common law claims of trademark infringement and unfair competition is the same as under the federal trademark infringement claim."). Because reaching that conclusion "is a question of state law that the parties do not challenge on appeal, we treat the district court's holding as correct and merely determine

months after filing suit, Wreal moved for a preliminary injunction, which the district court referred to the magistrate judge and ultimately denied. We affirmed that denial. *See Wreal I*, 840 F.3d at 1246.

After the close of discovery, Amazon moved for summary judgment. The district court again referred the motion to the magistrate judge for a report and recommendation, and the magistrate judge recommended granting the motion. Over Wreal's objections, the district court adopted the report and recommendation and granted summary judgment to Amazon. Wreal then timely appealed.

## II.    STANDARDS OF REVIEW

"We review a district court's grant of summary judgment *de novo* and apply the same legal standards as the district court." *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 646 (11th Cir. 2007). Summary judgment is appropriate only when the record shows that there is no genuine issue of material fact such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In conducting this inquiry, we view the evidence and reasonable inferences drawn therefrom in the light most favorable

---

whether the district court properly decided the Lanham Act count[s]." *Tana v. Dantanna's*, 611 F.3d 767, 772 (11th Cir. 2010); *see also Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 716 F.2d 833, 839 (11th Cir. 1983) ("If we determine that the district court decided the Lanham Act count[s] properly, we will also affirm its decision on the [state] deceptive trade practices and [fraud] counts.").

to the nonmovant.  *Forman*, 509 F.3d at 1356.  After discovery, summary judgment is appropriately entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[9]

## III.    ANALYSIS

Wreal argues that Amazon's use of the mark fireTV infringed its trademark FyreTV under a reverse-confusion theory—

---

[9] Amazon argues that Wreal has waived any challenge to the factual conclusions reached by the magistrate judge and adopted, without review, by the district court.  In support, Amazon first directs our attention to Wreal's statement of facts submitted in opposition to Amazon's motion for summary judgment and the magistrate judge's conclusion that Wreal did not present sufficient evidence of a genuine dispute for many of the facts at issue.  Second, Amazon argues that Wreal failed to object to the magistrate judge's recitation of facts in the objections Wreal filed with the district court.  Our review of the record establishes that Wreal did, in fact, object to many of the conclusions the magistrate judge reached regarding the parties' competing statements of facts.  And, as a matter of law, we are obligated to review the district court's grant of summary judgment de novo, applying the same legal standards as the district court.  *Custom Mfg. & Eng'g*, 508 F.3d at 646.  This means we place ourselves in the shoes of the district court and apply whatever legal standard governed the district court in resolving the summary judgment motion.  Because Wreal did object to the many of the magistrate judge's factual conclusions and resolution of certain factual disputes, we review those portions of the report and recommendation de novo.  For factual conclusions in the report that were not objected to, we review for plain error.  *See Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1214 n.6 (11th Cir. 2021); 11th Cir. R. 3-1.

the resolution of which boils down to the likelihood of confusion between the two marks.  To prevail on a claim of trademark infringement, a plaintiff must show: (1) that its marks were entitled to protection, and (2) that the defendant used marks that were either identical with the plaintiff's marks, or so similar that they were likely to confuse consumers.  *See* 15 U.S.C. § 1125(a); *Forman*, 509 F.3d at 1356.  The first element—whether Wreal's mark is entitled to protection—is not in dispute; the district court did not rule on that ground and the parties do not raise it in this appeal.  Instead, this case turns on the second element—likelihood of confusion.  "[L]ikelihood of confusion occurs when a later user uses a tradename in a manner which is likely to cause confusion among ordinarily prudent purchasers or prospective purchasers as to the source of the product."  *Cap. Films Corp. v. Charles Fries Prods., Inc.*, 628 F.2d 387, 393 (5th Cir. 1980).[10]

In determining the likelihood of confusion, we consider the following seven factors:

> (1) distinctiveness of the mark alleged to have been infringed;
>
> (2) similarity of the infringed and infringing marks;
>
> (3) similarity between the goods or services offered under the two marks;

---

[10] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to October 1, 1981.

(4) similarity of the actual sales methods used by the two parties, such as their sales outlets and customer base;

(5) similarity of advertising methods;

(6) intent of the alleged infringer to misappropriate the proprietor's good will; and

(7) existence and extent of actual confusion in the consuming public.

*Forman*, 509 F.3d at 1360.  These factors should not be applied mechanically.  "The issue of likelihood of confusion is not determined by merely analyzing whether a majority of the subsidiary factors indicates that such a likelihood exists.  Rather, a court must evaluate the weight to be accorded the individual factors and then make its ultimate decision."  *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1538 (11th Cir. 1986).  "The appropriate weight to be given to each of these factors varies with the circumstances of the case."  *Id.*  A court, however, is "required to consider each of the seven factors."  *Forman*, 509 F.3d at 1361.

Although likelihood of confusion generally is a question of fact, *see Jellibeans, Inc. v. Skating Clubs of Ga., Inc.,* 716 F.2d 833, 840 n.16 (11th Cir. 1983), in limited circumstances it may be decided as a matter of law via summary judgment, *see Tana v. Dantanna's*, 611 F.3d 767, 775 n.7. (11th Cir. 2010).  In deciding whether to grant summary judgment, each of the seven factors must be considered.  But because the weight to be given to each factor will vary depending on the circumstances of the case, summary judgment

may still be appropriate even if some of the factors do not support the movant. *See id.* at 782 (affirming summary judgment where two factors supported nonmovant); *Forman*, 509 F.3d at 1361 (affirming summary judgment where three factors supported nonmovant).

In order to resolve this appeal, we must determine how these seven likelihood-of-confusion factors apply in the context of reverse-confusion trademark infringement. The "paradigm case [of reverse confusion] is that of a knowing junior user with much greater economic power who saturates the market with advertising of a confusingly similar mark, overwhelming the marketplace power and value of the senior user's mark." 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:10 (5th ed.); *see also Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 957 (7th Cir. 1992) ("Reverse confusion occurs when a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user. In such a case, the junior user does not seek to profit from the good will associated with the senior user's mark.") Because both the harm and the theory of infringement in a reverse-confusion case differ from what is claimed in a forward-confusion case, the analysis and application of the seven likelihood-of-confusion factors differ as well.

In a reverse-confusion case, the harms that can occur are varied. For example, consumers may come to believe the smaller, senior user of the mark is itself a trademark infringer, *see Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 490 (2d Cir. 1988), or

19-13285              Opinion of the Court                    17

that the defendant's use of the mark diminishes the value of the plaintiff's mark as a source indicator, *see Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 301–02 (3d Cir. 2001). As our sister court, the Sixth Circuit has stated in a reverse confusion case:

> [t]he public comes to assume the senior user's products are really the junior user's or that the former has become somehow connected to the latter. The result is that the senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.

*Ameritech, Inc. v. Am. Info. Techs. Corp.*, 811 F.2d 960, 964 (6th Cir. 1987). In this case, Wreal contends that "Amazon's use of Wreal's mark creates a likelihood that consumers will believe that Amazon is the *source* of Wreal's FyreTV service."

With these principles in mind, we turn to the seven-factor test for likelihood of confusion and analyze each of the factors and their application in a reverse-confusion case. As with all species of trademark infringement, however, the "rule of reverse confusion is highly fact-specific and depends for its application on the presence of a critical mass of key facts." 4 McCarthy, *supra*, § 23:10. The seven factors used to assess likelihood of confusion—regardless of what theory of infringement is implicated—should never be applied mechanically.

### A. Distinctiveness of the Mark

In the typical forward-confusion case, this factor focuses only on the conceptual strength of the plaintiff's mark.[11]  *See Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999) ("Classifying the type of mark Plaintiff has determines whether it is strong or weak.").  This is because in a forward-confusion case, the plaintiff's theory is that the defendant—a newer user of the mark at issue—is attempting to profit off the plaintiff's goodwill and reputation.  And here, the district court did assess the

---

[11] We have summarized the inquiry into the strength of the mark as follows:

> There are four categories of marks: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary.  The categories are based on the relationship between the name and the service or good it describes.  Generic marks are the weakest and not entitled to protection—they refer to a class of which an individual service is a member (e.g., "liquor store" used in connection with the sale of liquor).  Descriptive marks describe a characteristic or quality of an article or service (e.g., "vision center" denoting a place where glasses are sold).  "Suggestive terms suggest characteristics of the goods and services and require an effort of the imagination by the consumer in order to be understood as descriptive."  For instance, "penguin" would be suggestive of refrigerators.  An arbitrary mark is a word or phrase that bears no relationship to the product (e.g., "Sun Bank" is arbitrary when applied to banking services).  Arbitrary marks are the strongest of the four categories.

*Frehling*, 192 F.3d at 1335–36 (citations omitted).

conceptual strength of Wreal's "FyreTV" mark and found it distinctive and strong.

But in a reverse-confusion case, the plaintiff is not arguing that the defendant is attempting to profit off the plaintiff's goodwill. Rather, the plaintiff asserts that the defendant—the junior but more powerful mark user—has been able to commercially overwhelm the market and saturate the public conscience with its own use of the mark, thereby weakening and diminishing the value of the senior user's mark. *See, e.g.*, *Checkpoint Sys.*, 269 F.3d at 302–03. Thus, in this situation, the conceptual strength of the plaintiff's mark is necessarily less important to the analysis. *See Com. Nat'l Ins. Servs., Inc. v. Com. Ins. Agency, Inc.*, 214 F.3d 432, 444 (3d Cir. 2000) (noting that "it is the strength of the larger, junior user's mark which results in reverse confusion"). Accordingly, when assessing the distinctiveness of the mark in a reverse-confusion case, the district court should consider both the conceptual strength of the plaintiff's mark and the relative commercial strength of the defendant's mark. *See Visible Sys. Corp. v. Unisys Corp.*, 551 F.3d 65, 74 (1st Cir. 2008) ("In a reverse confusion case, the focus is on the relative strengths of the marks so as to gauge the ability of the junior user's mark to overcome the senior user's mark."); *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 841 (2d Cir. 2002) (noting that the defendant's "extensive advertising gives it the ability to overwhelm any public recognition and goodwill that [the plaintiff] has developed in the mark"); *Walter v. Mattel, Inc.*, 210 F.3d 1108, 1111 n.2 (9th Cir. 2000) ("In a reverse confusion cases . . . the inquiry focuses

on the strength of the junior mark because the issue is whether the junior mark is so strong as to overtake the senior mark."); *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 231 (3d Cir. 2000) (noting that a plaintiff is more likely to succeed when "pitted against a defendant with a far stronger mark" in reverse confusion cases); *Checkpoint Sys.*, 269 F.3d at 303 ("But in a reverse confusion situation, the senior user's claim may be strengthened by a showing that the junior user's mark is commercially relatively strong.  The greater relative strength of the junior mark allows the junior user to 'overwhelm' the marketplace, diminishing the value of the senior user's mark."); *see also* 4 McCarthy, *supra*, § 23:10 ("A reverse confusion case is proven only if the evidence shows that the junior user was able to swamp the reputation of the senior user with a relatively much larger advertising campaign.").

Here, the district court did not consider the commercial strength of Amazon's mark because it found that Wreal waived the argument by failing to raise it in its response to Amazon's motion for summary judgment and instead raised it for the first time in its objections to the magistrate judge's report and recommendation.[12] The district court erred in that finding.  At the summary judgement

---

[12] The district court also noted that the presence of Amazon's "amazon" housemark alongside "fireTV" in advertisements pushed the distinctiveness-of-the-mark factor further in Amazon's favor.  As we discuss below, however, the presence of a housemark should be assessed in reference to the second factor in the analysis—the similarity of the marks.  *See A & H Sportswear*, 237 F.3d at 229–30.

stage, it was Amazon's burden, as the movant, to show that it was entitled to judgment as a matter of law, and the parties cannot "waive the application of the correct law or stipulate to an incorrect legal test." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 923 (11th Cir. 2018).

The commercial strength of Amazon's mark is manifest and appears in the record. Amazon admitted in its answer that the fireTV was launched with a major advertising campaign, was covered by major magazines and television networks, and that it was a bestseller. Amazon also admits that it advertises the fireTV in multiple brick-and-mortar locations, as well as on amazon.com, one of the most visited online shopping sites in the United States. In short, Amazon's overwhelming commercial success with the fireTV mark, coupled with the conceptual strength of Wreal's mark, pushes this factor firmly in Wreal's favor.

## B.  Similarity of the Marks

The similarity-of-the-marks analysis is, with one exception related to housemarks noted below, the same in both forward-confusion and reverse-confusion cases. We compare "the marks and consider[] the overall impressions that the marks create, including the sound, appearance, and manner in which they are used." *Frehling*, 192 F.3d at 1337. In doing so, we determine similarity based on "the total effect of the designation, rather than on a comparison of individual features." *Amstar Corp. v. Domino's Pizza,*

*Inc.*, 615 F.2d 252, 260–61 (5th Cir. 1980).[13]  "In evaluating the similarity of marks, we must consider the overall impression created by the marks, including a comparison of the appearance, sound and meaning of the marks, as well as the manner in which they are displayed." *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imps., Inc.*, 756 F.2d 1525, 1531 (11th Cir. 1985).  Similarity in any of these elements—appearance, sound, connotation, and commercial impression—may be sufficient to find the marks similar.  *See Stone Lion Cap. Partners, L.P. v. Lion Capital LLP*, 746 F.3d 1317, 1321 (Fed. Cir. 2014).

The district court concluded that the marks at issue—fireTV and FyreTV—were not similar.  It reached this conclusion mainly by focusing on the fact that the marks were spelled differently and used different fonts, as well as the fact that they were used differently in commerce.  The district court also noted that one of Wreal's experts, Dr. Linda Williams, testified that visitors to FyreTV.com would not confuse it with amazon.com.  The inquiry under this factor, however, is the similarity of the *marks*, not the similarity of the *services* or the similarity of the *sales methods*— each of which has their own factor and should thus be considered separately.

When the focus is on the similarity of the marks themselves, the result is clear—FyreTV and fireTV are nearly identical.  "Fire"

---

[13] *See supra* note 10.

is the first and only dominant word in both marks, and it is presented in a phonetically and connotatively identical fashion. It is also an abstract term, and thus the only term in either mark that gives the mark meaning. *See Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1372 (Fed. Cir. 2005) (finding similarity between "VEUVE ROYALE" and "VEUVE CLICQUOT" because "VEUVE . . . remains a 'prominent feature' as the first word in the mark and the first word to appear on the label"); *Century 21 Real Estate Corp. v. Century Life of Am.*, 970 F.2d 874, 876 (Fed Cir. 1992) (finding similarity between "CENTURY 21" and "CENTURY LIFE OF AMERICA" in part because "consumers must first notice th[e] identical lead word"); *see also In re Detroit Athletic Co.*, 903 F.3d 1297, 1303 (Fed. Cir. 2018) (finding "the identity of the marks' two initial words is particularly significant because consumers typically notice those words first"). By contrast, the secondary word in the marks—"TV"—is merely descriptive of or generic for the goods and services sold—i.e., streaming services. *See Frehling*, 192 F.3d at 1337 (noting that "a mark may be surrounded by additional words of lesser importance and not have its strength diluted").

Moreover, the marks need not be identical, as the "purpose in considering the similarity of marks as an indicator of likelihood of confusion is that the closer the marks are, the more likely reasonable consumers will mistake the source of the product that each mark represents." *Id.* Thus, while "Fyre" and "fire" are spelled differently, and one is capitalized, the words have the same

connotation and pronunciation, and the differences in font, color, and capitalization are not dispositive.

The Ninth Circuit's decision in *Dreamwerks Production Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1130 (9th Cir. 1998) is instructive on this point. In that case, the court had to assess the similarity of the marks "Dreamwerks" and "DreamWorks," which, like the marks at issue here, utilized different spellings and capitalization. *Id.* The Ninth Circuit concluded that the marks were similar, noting the obvious "perfect similarity of sound" and "similarity of meaning" while determining that even the similarity of sight *also* weighed in favor of a finding of similarity, as consumers "might shrug off the difference [in spelling and capitalization] as an intentional modification." *Id.* at 1131. Our decision in *Frehling* is also instructive. There, we said that the marks "BELL' OGGETTI" and "Tavola Collection by OGGETTI" were similar because the presence of the dominant and protected "OGGETTI" in both was likely to be confusing. *Frehling*, 192 F.3d at 1337. Each of these conclusions applies here.

Amazon's pervasive use of its "amazon" housemark alongside "fireTV" in advertisements warrants separate discussion. In forward-confusion cases—where a commercially superior plaintiff with a strong conceptual mark sues a defendant for attempting to profit off its goodwill—the presence of a housemark is indeed likely to dispel confusion in ordinarily prudent consumers. *See, e.g.*, *Custom Mfg.*, 508 F.3d at 652 n.10. But in reverse-confusion cases, this presumption is reversed; because the harm is false association of

the plaintiff's mark with the defendant's corporate identity, the defendant's use of a housemark alongside the mark is more likely to *cause* confusion. *See, e.g.*, *A & H Sportswear*, 237 F.3d at 230 (noting that there is a "possibility that the [housemark] will *aggravate*, rather than mitigate, reverse confusion, by reinforcing the association of the [trademark] exclusively with [the housemark]") (emphasis added); *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 39 (1st Cir. 2006) ("Yet since the alleged harm is *reverse* confusion, to the extent [the defendant's housemark] is itself the more recognized label the linkage could actually aggravate the threat to [the plaintiff]."); *Sands*, 978 F.2d at 954 ("Clearly, then, the fact that the Gatorade trademark always appears in Quaker's 'Thirst Aid' advertisements does not preclude a finding that those advertisements also use 'Thirst Aid' as a trademark."); *Banff*, 841 F.2d at 492 (finding that use of a housemark "may actually increase the misappropriation by linking defendant's name to plaintiff's goodwill" and company); *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1088 (7th Cir. 1988) ("DCN and Mighty Star further invite us to infer that the defendants' use of its house mark '24K Polar Puff' in conjunction with the International Kennel Club name on its advertising decreases the likelihood of confusion among consumers. This argument is a smoke screen and a poor excuse for the defendants' blatant misappropriation of the plaintiff's name . . . ."), *abrogation recognized on other grounds*, *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020); *Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1288 (9th Cir. 1992) ("Indeed, use by Russ of its housemark along with Amtra's trademark may

'be an aggravation and not a justification, for it is openly trading in the name of another upon the reputation acquired by the device of the true proprietor.'" (quoting *Menendez v. Holt*, 128 U.S. 514, 521 (1888))).

Amazon's use of its housemark alongside advertisements for the "fireTV" does exactly what one might expect it to do: it causes consumers to associate Amazon with fireTV.  Because this is a reverse-confusion case asserting that Amazon's use of fireTV causes consumers to associate FyreTV with Amazon instead of Wreal, Amazon's use of the housemark supports Wreal's theory of recovery.  The district court erred in concluding otherwise.

In short, the parties' marks are nearly identical.  Both use the same words, are pronounced the same, and have the same meaning.  While they are spelled slightly differently and use different fonts, this is not enough to conclude that the marks are dissimilar.  Moreover, Amazon's pervasive use of its housemark alongside "fireTV" pushes this factor even further in favor of Wreal, as it is likely to confuse consumers into believing that Amazon is the origin of the FyreTV mark.  Thus, the similarity-of-the-marks factor weighs heavily in favor of Wreal.

## C.  Similarity of the Products

The analysis of this factor is the same regardless of the theory of confusion, and "requires a determination as to whether the products are the kind that the public attributes to a single source, not whether or not the purchasing public can readily distinguish

between the products of the respective parties." *Frehling*, 192 F.3d at 1338; *accord E. Remy Martin*, 756 F.2d at 1530 ("The question, however, is not whether the purchasing public can readily distinguish [between the products,] but whether the products are the kind the public attributes to a single source."). The products at issue need only be "related in some manner and/or if the circumstances surrounding their marketing are such that they could give rise to the mistaken belief that [the goods and/or services] emanate from the same source." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1369 (Fed. Cir. 2012) (quoting *7-Eleven Inc. v. Wechsler*, 83 U.S.P.Q.2d 1715, 1724 (T.T.A.B. 2007)). In reverse-confusion cases, it also is relevant to ask whether consumers might expect the defendant to "bridge the gap" and enter the plaintiff's market. *See Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 480 (3d Cir. 1994).

Here, many pieces of record evidence are relevant to the question of whether the fireTV set-top box is similar to the Fyre-BoXXX. The record evidence presented in the district court established that consumers were already able to stream softcore pornography on Amazon's fireTV through content providers like HBO GO and Showtime. The record evidence also established that Amazon Prime Instant Video—Amazon's own streaming service, which, like HBO GO and Showtime, is available on the fireTV—offered consumers softcore pornography. And the record evidence also established that: (1) Amazon already offered the sale of hardcore pornographic DVDs and magazines on its related consumer

website, amazon.com; (2) the parties' devices are visually similar—both are plain black set-top boxes that come with a small remote; and (3) Amazon's direct competitors in the mainstream set-top box market—Roku and Apple TV—already provided access to hardcore pornography, including FyreTV.

The question therefore is whether this record evidence would suggest to an ordinarily prudent consumer that a do-it-all giant like Amazon—which already sells a set-top box that streams softcore pornography and which competes against other set-top boxes that stream hardcore pornography—would "bridge the gap" to hardcore pornography streaming and release a set-top box that streams exclusively pornographic content. We answer that question in the affirmative. Amazon is a company that already sells hardcore pornography on its website and offers softcore pornography on its set-top box. And it competes in a market in which its direct competitors offer hardcore pornography streaming directly on their set-top boxes. Given this information, a reasonable juror could conclude that Amazon decided to "bridge the gap" and offer a standalone set-top box dedicated to streaming hardcore pornography. *See id.* The two products at issue therefore "are the kind the public attributes to a single source." *E. Remy Martin*, 756 F.2d at 1530.

Our caselaw provides ample support for this conclusion.[14] In *E. Remy Martin*, a trademark dispute between a wine company and a liquor company, this Court concluded that cognac and brandy—the products sold by the liquor company—were distilled from wine and that, as a result, it was "quite likely that, even assuming a sophisticated consumer from the drinking world, such a consumer could easily conclude that [the liquor company] had undertaken the production and sale of wine and that its name and goodwill therefore attached to [the wine company's] product." 756 F.2d at 1530. Similarly, in *Frehling*, we concluded that the district

_____

[14] In reaching the opposite result, the district court relied on our decisions in *Tana* and *Ross Bicycles, Inc. v. Cycles USA, Inc.*, 765 F.2d 1502 (11th Cir. 1985). But both cases are readily distinguishable. In *Tana*, we held that ordinary consumers would not confuse an "old-world-style Italian restaurant where mustached waiters dressed in tuxedos serve classic Italian dishes" with "an upscale sports restaurant, targeting sports enthusiasts and serving contemporary American cuisine in a modern setting decorated with flat-screen televisions." 611 F.3d at 778. And in *Ross Bicycles*, we stated that two bicycle companies—which, critically, both sold *only* bicycles—did not sell similar products due to the differences in the "size of the tubing, the style of wheels, pedals, seats, kickstands, and the difference in the frame angles." 765 F.2d at 1507. Both cases were forward-confusion cases in which the parties at issue competed in only one, identical market—restaurants in *Tana* and bicycles in *Ross Bicycles*. And because the parties competed in precisely the same market, we focused on granular differences between the products at issue to resolve the claim. Here, by contrast, the claim is one of reverse-confusion, and one of the parties (Amazon) offers products and services across a host of industries and media. The question here is thus whether a reasonable juror could conclude that Amazon had "bridged the gap" into hardcore pornography streaming and attribute the fireTV and the FyreBoXXX to a single source.

court erred in focusing only on the differences between two furniture makers (e.g., metal vs. wood). 192 F.3d at 1338. We also concluded that "[w]hile the compositional differences matter," the focus is "on the reasonable belief of the average consumer as to what the likely source of the goods was." *Id.* In further explanation of what a single source means for purposes of the similarity-of-the-products analysis, we stated:

> In this case, it is not unreasonable to fathom that the goods emanate from the same source. Both products are furniture pieces, designed for the home, and both have the capability to house electronic equipment. In addition, both products are marketed as having an Italian design and thus a consumer could, on this basis alone, given that both marks connote furniture, attribute the products to one source given the shared Italian theme.
>
> Therefore, although the products are somewhat dissimilar in composition, function, and design, they are similar in that they are both home furnishings sold under a very similar Italian label, and hence it seems possible that a consumer could attribute both products to a single source. While this possibility is perhaps not strong enough to suggest a likelihood of consumer confusion, neither is it so remote as to raise the opposite inference—that a reasonable consumer would likely not be confused. Thus, to the extent that the district court found that this factor favored ISG significantly, we find that the attribution of such

19-13285               Opinion of the Court                    31

weight to this factor in ISG's favor was clearly erro-
neous.

*Id.*

Decisions from our sister circuits in reverse-confusion cases
lend further support to our conclusion here. In *Attrezzi*, the First
Circuit held that the products of two "small electric appliance"
manufacturers were similar even though one manufacturer also
used the mark on its gourmet foods and dinnerware. 436 F.3d at
39. In *Dreamwerks*, the Ninth Circuit concluded that a movie stu-
dio and a convention holder had similar products because it would
not be unreasonable for consumers to presume that the production
company behind Star Trek decided to bridge the gap to convention
holding and had begun to host Star Trek conventions. *See* 142 F.3d
at 1131 ("[M]ovies and sci-fi merchandise are now as complemen-
tary as baseball and hot dogs. The main products sold at Dream-
werks conventions are movie and TV collectibles and memora-
bilia; the lectures, previews and appearances by actors which at-
tract customers to Dreamwerks conventions are all dependent, in
one way or another, on the output of entertainment giants like
DreamWorks.").

Here, as in *E. Remy Martin* and *Dreamwerks*, a reasonable
juror could conclude that Amazon was likely to market and sell a
product like Wreal's. Indeed, to see a do-it-all giant like Amazon
enter the pornographic streaming industry requires no more of an
inferential leap than seeing a movie studio begin holding public
conventions (as in *Dreamwerks*) or a liquor company begin selling

wine (as in *E. Remy Martin*).  Amazon already offers at least some softcore pornography on its streaming services and competes with other general-interest set-top boxes that offer hardcore pornography content on theirs, including the FyreTV streaming service at issue here.  Amazon also sells hardcore pornographic materials on its website.  It would not be unreasonable for a reasonable consumer to see FyreTV and think Amazon was the source.

Finally, we note that "the more similar the marks are, the less necessary it is that the products themselves be very similar to create confusion."  *Attrezzi*, 436 F.3d at 39.  Accordingly, we conclude that this factor favors Wreal.

### D.  Similarity of Sales Outlets and Customer Bases

As for the "similarity of sales outlets" factor, we have held:

> This factor takes into consideration where, how, and to whom the parties' products are sold.  Direct competition between the parties is not required for this factor to weigh in favor of a likelihood of confusion, though evidence that the products are sold in the same stores is certainly strong.  The parties' outlets and customer bases need not be identical, but some degree of overlap should be present.

*Frehling*, 192 F.3d at 1339 (citations omitted). The analysis of this factor is the same in forward-confusion and reverse-confusion cases.

Here, the district court concluded that the "similarity of sales outlets" factor weighs in favor of Amazon.  Amazon's fireTV

is available everywhere—on multiple internet sites and in brick-and-mortar locations around the world. Wreal's FyreTV, on the other hand, is available in only one place and can only be purchased one way—a consumer must make his way to FyreTV.com, navigate through an eighteen-year-olds-only banner, certify that he is interested in purchasing pornography, and find the product on the website. And crucially, Amazon's fireTV is unavailable on FyreTV.com. Both *where* the products are sold and *how* the products are sold are thus different. Only to *whom* the products are sold is arguably similar, as the record evidence shows that both companies target twenty- to fifty-year-old men with disposable income. The difference, however, is that Wreal targets only individuals who "are interested in purchasing pornography"—a uniquely identifiable subset of Amazon's customer base. *Cf. Amstar*, 615 F.2d at 262 (noting that Domino Sugar and Domino's Pizza had different sales outlets and customer bases because they were distributed through different outlets despite the fact both were "in the restaurant business"). We therefore conclude that this factor favors Amazon.

### E. Similarity of Advertising

This similarity of advertising "factor looks to each party's method of advertising." *Frehling*, 192 F.3d at 1339. "[T]he standard is whether there is likely to be significant enough overlap in the readership of the publications in which the parties advertise that a possibility of confusion could result." *Id.* at 1340. This inquiry is the same in both forward- and reverse-confusion cases.

There is no dispute in this case that the parties advertise in completely different media.  Amazon advertises the fireTV on the amazon.com homepage, on television, in print media, and on in-store displays.  Wreal stopped advertising on television and in print in 2012, two years before Amazon launched the fireTV.  In fact, at all times relevant to the lawsuit, Wreal advertised the FyreTV and FyreBoXXX only through pornographic websites, social media, and newsletters—i.e., only on the internet or other media dedicated to similarly prurient content.

Wreal nonetheless argues that this factor favors it because, very broadly speaking, both the fireTV and the FyreBoXXX advertise through search engines, word of mouth, and social media.  But Wreal presented no record evidence of audience overlap.  Nor does Wreal identify any website (outside of search engines like Google) where both the fireTV and the FyreBoXXX are advertised.  As we explained in *Tana*, rejecting a similar argument: "[T]he only similarity in the advertising channels used by the two parties is their maintenance of websites on the World Wide Web.  This similarity would dispel rather than cause confusion, however, because the websites are separate and distinct, suggesting two completely unrelated business entities."  611 F.3d at 778; *see also Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 637 (6th Cir. 2002) (noting that the availability of information about the parties' goods on the internet does not lead to the conclusion that they use the same marketing channels).

We therefore conclude that this factor weighs heavily in Amazon's favor.

### F. Amazon's Intent

In the forward-confusion context, the intent factor asks whether the "defendant adopted [the] plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation." *Frehling*, 192 F.3d at 1340. This is because in forward-confusion cases, "customers mistakenly think that the junior user's goods or services are from the same source as or are connected with the senior user's goods or services." 4 McCarthy, *supra*, § 23:10. Without precedent pointing in any other direction, the district court understandably applied this test for intent and found that Amazon did not adopt the fireTV mark with any intent to derive a benefit from Wreal's FyreTV mark.

But reverse-confusion cases are different. In this context, the concern is that customers will "purchase the senior user's goods under the mistaken impression that they are getting the goods of the junior user." *Id.* In other words, that "the junior user's advertising and promotion so swamps the senior user's reputation in the market that customers are likely to be confused into thinking that the senior user's goods are those of the junior user." *Id.* In this case, Wreal is not suggesting that Amazon chose the fireTV mark with the intention of siphoning Wreal's goodwill; instead, Wreal claims that, by Amazon's use of the fireTV mark, Wreal has lost control over its own, more senior mark.

Courts have responded to this problem in varying ways. The Seventh Circuit, for example, has eliminated the intent element from its likelihood-of-confusion test in reverse-confusion cases. *See Sands*, 978 F.2d at 961. The Third Circuit has acknowledged that evidence of intent to infringe is not expected in reverse-confusion cases, but continues to consider such evidence if it exists. *See A & H Sportswear*, 237 F.3d at 232. And the Tenth Circuit, while similarly discounting the importance of the intent factor in reverse-confusion cases, has continued to apply it in the same manner in both forward- and reverse-confusion cases. *See Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1531–32 (10th Cir. 1994). Finally, the Ninth Circuit applies a modified version of the intent factor in reverse-confusion cases, under which indicia of intent may come from a variety of sources:

> At one extreme, intent could be shown through evidence that a defendant deliberately intended to push the plaintiff out of the market by flooding the market with advertising to create reverse confusion. Intent could also be shown by evidence that, for example, the defendant knew of the mark, should have known of the mark, intended to copy the plaintiff, failed to conduct a reasonably adequate trademark search, or otherwise culpably disregarded the risk of reverse confusion. The tenor of the intent inquiry shifts when considering reverse confusion due to the shift in the theory of confusion, but no specific type of evidence is necessary to establish intent, and the

importance of intent and evidence presented will vary
by case.

*Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 934–35 (9th Cir.
2017) (citations omitted).

We agree with and adopt the Ninth Circuit's approach. Evidence of a specific intent to deceive is not a prerequisite to establish intent in reverse-confusion cases, as it is in forward-confusion cases. Indicia of intent can come from a wide variety of sources, including a more generalized intent to obtain market saturation or to proceed with the adoption of a mark in circumstances where the defendant had constructive knowledge of the plaintiff's mark. The facts of each case will vary, and district courts should accord the intent factor whatever weight it is due under the circumstances.

Here, applying this standard, the evidence of intent is strong. First, Amazon has admitted that, before launching the fireTV, it had actual knowledge of both the FyreBoXXX and Wreal's FyreTV trademark registration. *Wreal I*, 840 F.3d at 1247 ("Amazon was aware of Wreal's FyreTV mark when it launched Fire TV but did not contact Wreal before launching Fire TV."). Amazon's Vice President of Marketing further testified in his deposition that Amazon not only chose to proceed with its usage of the fireTV mark after becoming aware of the FyreTV registration, but that his "goal was customers . . . if they search for Amazon Fire TV, if they search for our product I did not want them to first come across a porn site and have that experience." The district court, upon reviewing that testimony, concluded that no reasonable juror could view it and

conclude that Amazon had any "bad faith (or other) intent to deceive consumers or drive Wreal out of the market." That conclusion was erroneous. The record evidence established that when Amazon launched the fireTV, it specifically tried to flood the market with advertising in an attempt to lower awareness of Wreal's similarly named mark. We take Amazon at its word, and we therefore conclude that the intent factor weighs heavily in favor of Wreal.

## G. Actual Confusion

"[E]vidence of actual confusion is the best evidence of a likelihood of confusion." *Frehling* 192 F.3d at 1340. But the presence of such evidence is obviously not a prerequisite to a finding of likelihood of confusion, as it is one of seven factors considered in the likelihood-of-confusion determination. *Id.* Indeed, "it is not necessary to show actual confusion. One merely has to show that the likelihood of confusion exists." *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971).[15] But in assessing the quantum of actual confusion required for a finding in the plaintiff's favor, even a "very little" amount of actual confusion is highly probative. *See id.*

"The strength of such evidence depends on 'the number of instances of confusion,' 'the kinds of persons confused' and the 'degree of confusion.'" *Sovereign Mil. Hospitaller Order of Saint John*

---

[15] *See supra* note 10.

*of Jerusalem of Rhodes & of Malta v. Fla. Priory of the Knights Hospitallers of the Sovereign Order of Saint John of Jerusalem, Knights of Malta, the Ecumenical Order*, 809 F.3d 1171, 1189 (11th Cir. 2015) (quoting *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1167 (11th Cir. 1982)).  But even more important than the *number* of persons confused is the *type* of person confused; our "caselaw makes plain that the consumers of the relevant product or service, especially the mark holder's customers, turn the key."  *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 936 (11th Cir. 2010); *see also Frehling*, 192 F.3d at 1341.  Indeed, we have accorded "substantial weight" to any instances of "evidence that actual customers were confused by the use of a mark as opposed to other categories of people." *Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1240 (11th Cir. 2008) (quoting *Safeway Stores*, 675 F.2d at 1167).

In reverse-confusion cases, evidence of forward confusion will usually be probative. *See Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 473 (3d Cir. 2005).  But even more relevant is direct evidence of *reverse* confusion—i.e., evidence that consumers of the plaintiff's more senior mark became confused as to its source following the launch of the defendant's more junior mark. *See Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 741 (2d Cir. 1994) (noting that, in a reverse-confusion claim, "the relevant issue is whether consumers mistakenly believe that the senior user's products actually originate with the junior user" and that "it is appropriate to survey the senior user's customers").    Survey

evidence—while perhaps more accurately described as circumstantial evidence of confusion[16] rather than direct evidence—is, of course, admissible.  But because the theory of reverse confusion depends on market saturation by the defendant's mark, a reliable survey "cannot be run in a reverse confusion case prior to the junior user's saturation of the market with its mark because, until that time, consumers have not been exposed to the relatively large advertising and promotion of the junior user that is the hallmark of a reverse confusion case."  4 McCarthy, *supra*, § 23:10.

The record evidence here contains some evidence of actual confusion.  For example, Wreal introduced evidence that one of its customers asked over Twitter, "Did you guys just merge with Amazon?"  And one of Amazon's customers communicated with Amazon to ask whether he could access "adult content" on his Amazon "fyre" TV.  Both instances directly suggest reverse confusion; the first consumer believed Amazon had purchased Wreal's trademark, and the second consumer contacted Amazon to inquire

---

[16] *See* Harvey S. Perlman, *The Restatement of the Law of Unfair Competition: A Work in Progress*, 80 Trademark Rep. 461, 472 (1990) ("Most surveys do not measure actual confusion. Surveys only give us information about a controlled and artificial world from which we are asked to draw inferences about the real world.").

19-13285                Opinion of the Court                41

about Wreal's product.[17]  But these are the only two true instances of confusion present in the record.[18]

Amazon and Wreal both also introduced survey evidence regarding the rate of confusion.  Dr. Thomas Maronick, who testified for Wreal at the preliminary injunction hearing, conducted a preliminary survey in April 2014 and found "very low consumer confusion" between FyreTV and fireTV.  Dr. Maronick also testified that awareness of the FyreTV mark was "very low."  In a similar vein, Dr. Dan Sarel, Amazon's expert, conducted a consumer survey and found a confusion rate of one percent, which he testified was "nonexistent" and "statistically insignificant."

---

[17] The magistrate judge (and, by its adoption, the district court) discounted both pieces of evidence, concluding that neither consumer was *actually* confused.  As already discussed in footnote 5, *supra*, this amounted to an improper credibility determination that invaded the province of the jury.  *See Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("Where the non-movant presents direct evidence that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the movant presents conflicting evidence.  It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment.").

[18] Wreal identified other pieces of evidence to the district court, but our review of the record indicates that they do not represent direct evidence of actual confusion.  For example, one of Wreal's customers said, "I plan to buy the new Amazon FireTV box (I know it is NOT related to you guys—although confusion over the name may bring Fyretv some more customers and maybe a domain name sale windfall—more power to you!) Will this new Amazon streaming device have a private channel installation of FyreTV in the near future?"

We hesitate to give significant weight to either the specifically identified instances of actual confusion or the surveys. Amazon introduced evidence from an expert witness, Peter Lehman, that tended to suggest that watching pornography is an inherently shameful act, and that consumers of pornography are less likely to report their consumption than consumers of other media. With this testimony in mind, we turn first to the first two instances of actual confusion.

Our caselaw is clear that the "the quantum of evidence needed to show actual confusion is relatively small." *Jellibeans, Inc.,* 716 F.2d at 845. But our caselaw imposes no hard-and-fast rule regarding the number of instances required to prevail. *See Caliber Auto. Liquidators*, 605 F.3d at 937. "Rather, the court must evaluate the evidence of actual confusion in the light of the totality of the circumstances involved." *AmBrit*, 812 F.2d at 1543; *accord World Carpets*, 438 F.2d at 489 (5th Cir. 1971)[19] ("[R]eason tells us that while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof.").

Our previous decisions serve as guides. In *Safeway Stores*, when reviewing a district court's findings following a bench trial, we held that a mere two instances of confusion from relevant consumers was worthy of consideration. 675 F.2d at 1166–67,

---

[19] *See supra* note 10.

*abrogation recognized on other grounds*, *PlayNation Play Sys., Inc. v. Velex Corp.*, 924 F.3d 1159, 1166 (11th Cir. 2019). Additionally, in *Caliber Automotive*, we stated that two instances of confusion among professional buyers weighed in the plaintiff's favor at the summary judgment stage. 605 F.3d at 937–38. In contrast, in *Frehling*, when reversing the district court's entry of judgment for the defendant following a bench trial, we concluded that a single instance of actual confusion from a "professional buyer" while "sufficient to raise an inference of actual confusion" was "not sufficiently dispositive so as to favor either side in an appreciable fashion." 192 F.3d at 1341.

Perhaps most analogous are our decisions in *AmBrit* and *PlayNation*. In *AmBrit* as in this case, the relevant products (ice cream novelties there and set-top boxes, here) were sold to the general public, not professional buyers, and had a "high volume of sales" (at least, such is the case for the fireTV here). *See* 812 F.2d at 1544. The district court in *AmBrit*, after a bench trial, found that four instances of actual confusion supported a finding of actual confusion in favor of the plaintiff. *See id.* And we, reviewing for clear error, affirmed. *See id.* at 1544–45. Similarly, in *PlayNation*, the products at issue were playground equipment and pull-up bars which, like ice cream novelties and set-top boxes, are sold to the general public rather than to professional buyers. *See* 924 F.3d at 1164. Following a bench trial, the district court found that just two instances of actual confusion—in which the plaintiff's customers contacted the defendant for customer support—were sufficient to

support a finding of actual confusion. *See id.* at 1167. On appeal, we affirmed the ruling. *See id.* at 1167–68.

As in *AmBrit* and *PlayNation*, the reported instances of confusion in this case are relatively few. Even after years of litigation, Wreal is able to identify only two instances of potential or actual Wreal consumers being confused as to the source of its product. But the record also contains expert testimony that consumers of pornography are less likely to report their consumption than consumers of other media. Given that we are obliged to "evaluate the evidence of actual confusion in the light of the totality of the circumstances involved," *AmBrit*, 812 F.2d at 1543, we find it appropriate here to take that expert testimony into account when considering the number of reported instances of actual confusion. Although a close call, we conclude that the two reported instances of actual confusion here are sufficient to make the issue one of triable fact and thus weighs in Wreal's favor.

Turning to the survey evidence, both parties advance a number of arguments either for or against the consideration of the surveys. But given that we conclude that the instances of actual confusion present in the record are sufficient to push this factor in Wreal's favor, we conclude that it is unnecessary to also address the issue of survey evidence especially as a plaintiff need not present survey evidence in a trademark claim in order to escape summary judgment. *See PlayNation*, 924 F.3d at 1169 ("Lack of survey evidence does not weigh against the plaintiff when determining likelihood of confusion."); *Midwestern Pet Foods, Inc. v. Societe*

*des Produits Nestle S.A.*, 685 F.3d 1046, 1054 (Fed. Cir. 2012) ("[N]either the Board nor this court has required survey evidence in order to show a likelihood of confusion."); *Badger Meter v. Grinnell Corp.*, 13 F.3d 1145, 1153 (7th Cir. 1994) ("[Defendant] argues strenuously that [plaintiff's] failure to introduce any market survey evidence of likely consumer confusion militates against finding such a likelihood; once again, however, this goes to the weight and not to the sufficiency of the evidence."). And, as already noted above, at least in our circuit, survey evidence in trademark actions has always been viewed with a skeptical eye. *See Frehling*, 192 F.3d at 1341 n.5 ("This Circuit . . . has moved away from relying on survey evidence [in trademark cases]."); *Safeway Stores*, 675 F.2d at 1167 n.10 (noting that our circuit has "followed the trend of cases in the former Fifth Circuit, in which market surveys have not fared well as evidence in trademark cases").

## IV.    CONCLUSION

This case addresses the application of the seven likelihood-of-confusion factors to a reverse-confusion trademark infringement case. Although some of those factors are analyzed and applied in the same way in both reverse-confusion cases and the more familiar forward-confusion cases, there are important differences in how other factors are analyzed and applied that stem from the fact that the harm and the theory of infringement differ between forward and reverse confusion.

Here, the record evidence establishes that Amazon acquired actual knowledge of Wreal's registered trademark and still

launched a product line with a phonetically similar name.  The two marks at issue are nearly identical, the commercial strength of Amazon's mark is consistent with Wreal's theory of recovery, the parties' services are the kind that a reasonable consumer could attribute to a single source, and the record establishes that Amazon intended to swamp the market with its advertising campaign.  Furthermore, Wreal has identified two consumers who a reasonable juror could conclude were confused by Amazon's chosen mark.

As noted throughout our decision, there is no mechanical formula for applying the seven factors relating to likelihood of confusion.  But when considering all seven factors as they apply to a theory of reverse confusion and taking all the circumstances of this case into account on the record before us, we conclude that they weigh heavily in favor of Wreal and that the district court erred when it entered summary judgment in Amazon's favor.  We therefore reverse the district court's order.  This is not to say that Amazon may not ultimately prevail on the merits; rather, it must do so before a jury.

**REVERSED AND REMANDED.**